740 A.2d 630 (1999)
326 N.J. Super. 1
CITY OF OCEAN CITY, Plaintiff-Appellant,
v.
Gerard and Constance MAFFUCCI, and 2910 Wesley Avenue Condominium, Defendants, and
2825 Wesley Avenue Condominium, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted April 13, 1999.
Decided July 22, 1999.
*631 Youngblood, Corcoran, Aleli, Lafferty, Stackhouse, Grossman & Gormley, Pleasantville, for plaintiff-appellant (Gerald Corcoran, on the brief).
Porro & Porro, Lyndhurst, for defendant-respondent (Alfred A. Porro, Jr., on the brief).
Before Judges LONG and CARCHMAN.
The opinion of the court was delivered by LONG, P.J.A.D.
Defendants Gerard and Constance Maffucci, individually and as principals of the 2910 Wesley Avenue Condominium, and Louis and Martha Spadaccino, as principals of the 2825 Wesley Avenue Condominium, own beachfront duplexes on Wesley Avenue in Ocean City.
In 1993, as a result of a joint project of the State of New Jersey and the Army Corps of Engineers to build new sand dunes along seven miles of Ocean City beach, Ocean City sought to purchase an easement from the beachfront owners. In 1995, when a price could not be negotiated, the city instituted a condemnation action against defendants, the Maffuccis, 2910 *632 Wesley Avenue Condominium, and 2825 Wesley Avenue Condominium. Included in the proceeding was a fifty by eighty foot strip of beach in front of 2825 Wesley Avenue in which the Spadaccinos are first floor tenants. As a result of the dune project, the view of the ocean from the Spadaccino's condominium has been completely obstructed and direct access to the beach has been eliminated by nine foot high dune grasses. Beach access must be gained by a pathway 80 feet north of the condominium.
On July 22, 1997, after a hearing, three commissioners appointed to appraise the value of the easement taken by the City and set just compensation, issued a report declaring just compensation to be $1.00. No reasons were stated for this award. Defendants appealed.
A jury trial was held[1] at which the main issue was whether the defendants were entitled to severance damages. Defendants claimed that the easement damaged the remaining part of their property and diminished its market value by $100,000. The City countered that the easement caused no damage to the property as a whole.
A trial ensued at which Ackley O. Elmer, a real estate appraiser, testified for Ocean City. According to Elmer, because beach view and access rights have no value, loss of riparian (littoral)[2] rights did not devalue the property. Elmer undertook a comparative sales study of property in Ocean City. He testified that there is no difference in value between beachfront property and non-beachfront property. In measuring the current value of the condominium, Elmer did not include in his comparables any beachfront property. He testified that the loss of view suffered by the first floor of the condominium "had no effect at all" on the valuation. In fact, even "if the lower unit devalued, the upper unit increased in value." Elmer explained that the property must be considered "as a whole" for appraisal purposes, and not as two individual units in a duplex. Thus, he determined that the value of the easement was $1.00 and that there was no severance damage to the remaining land where the condominium was located.
Cyril Galvin, a coastal engineering expert, testified for defendants that the dune eliminated any view of or access to the beach from the Spadaccino's condominium. Galvin explained that the dune continually increased in height and width from the date of taking to the time of trial and that it would continue to do so:
The dune clearly blocks the line of sight to the water and this obstruction will increase markedly in the coming years because of the vegetation growth and the trapping of the sand from the newly widened beach.
In his report, Dr. Galvin also suggested that Elmer's analysis was skewed because he did not evenly distribute the dates of sales on properties he valued for comparison throughout the sales period he examined. In other words, Elmer examined 44 sales over four years (1986-1990) but not eleven a year. In 1988 he used nineteen sales, then 9, 6, and 7 in 1987, 1989, and 1990 respectively. Thus, according to Dr. Galvin, Elmer's comparables may have been skewed by fluctuations in the real estate market.
Chip Collins, a real estate expert, also testified for the defendant. Collins agreed *633 that the value of the easement was $1.00. However, he testified that the severance damages to the defendant were $100,000. Of this amount, $75,000 was damage to the first floor; $25,000 to the second floor. Collins calculated damages two ways: pursuant to the first method, he determined the value of the land taken plus the value of the remaining parcel before the taking, and subtracted the value of the remaining parcel after the taking. That is: $1 + $1,000,000 (1st floor: $425,000; 2nd floor: $575,000)$900,000 (1st floor: $350,000; 2nd floor: $550,000) = $100,001. These "before and after taking" figures were based on comparable sales. Method two valued the entire parcel before the taking and subtracted the value of the entire parcel after the taking. ($1,000,000$900,000= $100,000).
Specifically, Collins' "value of the remaining parcel after the taking" calculation was based on four things: loss of view, loss of direct beach access, loss of use, and loss of privacy.
Q: Now ... 2825 Wesley Condominium. Would you explain to us what you did there and what you found?
A: First of all, in applying the market data approach of before and after, I used the basis of loss in value by analyzing the property with the dune area. My conclusions were that there was loss in value to each of the respective floors individually. I analyzed it from four basic standpoints.
The first stand point was from the loss in value due to the loss of view. My conclusions were that there was a loss in value due to a loss in view from the first floor unit but not the second floor unit. The second area is that I determined that there was a loss in value due to a loss of direct access to the beach and the water. In my opinion that loss was applicable to both the first floor unit and the second floor unit.
The third area was also in value due to a loss in the use of that particular area. The open space enjoyment in the area being deprived by use was a loss suffered by the unit owners of both the first floor unit and the second floor unit. And fourth and finally, the loss in value due to the loss in the privacy by the creation of an alleyway with people walking directly in front of each of the units back and forth to the beach was a loss in value that was experienced by both the first floor and the second floor.
With these items in mind, the direct data approach was by trying to come up with comparable sales of the first floor unit and the second floor unit before the occurrence of these items and then applying it to the occurrence of these items after they took place, the before and after case.
Collins assigned loss of view 60%; loss of access 20%; loss of use 10%; and loss of privacy 10%. He testified that while it is still possible to smell and hear the ocean from 2825 Wesley Avenue, it is "barely" visible because of the dune, and "there is absolutely no view, whatsoever, of the strand as before." Collins disagreed completely with Elmer regarding the value of visual and physical access to the ocean. Collins, a real estate agent/broker who specializes in beach property, explained that in the "many years" he has rented, sold, and appraised beachfront property in Ocean City, beachfront makes a difference in value. Collins testified that close to "95%" of all people looking for property in Ocean City "want to be on the beach."
They want to be able to see the beach... they want to be able to see the ocean. They want to be able to use the adjacent lands on the beach. They want to enjoy the beachfront immediately in front of the property that they have. This is what determines the value of the property that we handle on the beach. People come to our shore to be able to see and enjoy the beach immediately in front of the property that they get. They do not come to the beach for safety factors. They do not come to the *634 beach for soil control. They come to the beach so they can sit and use it.
Collins testified that the "gold coast properties" (beachfront) have riparian rights which makes them valuable: "the value would be that you not only own the portion of your property that your home is on, but you also own the beach all the way out to the water."
[T]he value attached to that particular property is determined by the demand by what the people ... are going to use it for. That's what they want it for. That's why they buy these things. That's why they'll pay so much for propertyso much more for property on the beach....
As to the loss of direct access to the beach, Collins testified:
Q. How far is the access to the beach from this unit, the first floor unit?
A. Measured from where?
Q. I don't care, the north property one.
A. 80 feet.
Q. 80 feet?
A. 80 feet, yes.
....
Q. So isn't it a fact that although they lost some beach closer to the bulkhead, they've gained beach out towards the ocean.
A. Yes.
Q. And there's no net loss is there?
A. Except that the use of the beach directly adjacent to the property is in my opinion, very, very valuable.
....
A. [The beach] is not adjacent to the property [anymore] is what I'm referring to.
Q. Oh, so it's a fact they have to walk another 100 feet, that's a problem for them.
A. They lost more than 100 feet.
Q. 200 feet? How far is it?
A. Well, it's 80 to cross over and then they've got to go across the cross over and then they've got to go down another 150 feet or so [to reach the beach].
Q. That sounds like a problem now.
Concerning loss of use, Collins testified:
Q. Now, tell me what the second floor unit owners have lost from the beach?
A. They've lost the use of the beach directly in front of the property.
....
Q. But they can get to the ocean, right?
A. Yes.
Q. They can find the beach?
A. Yes.
Q. They can build sand castles?
A. Yes.
Q. They can picnic?
A. Yes.
Q. They can play football and they go in the water, all those things, correct?
A. Yes.
....
A. Except that the use of the beach directly adjacent to the property, is, in my opinion very, very valuable.
....
Q. Now, if Mr. Spadaccino wants to sit down [in the area between the dune and the porch] and read a book he can do it can't he?
A. Yes.
Q. And, if he wants to go out there at night and read a book, he can do it, can't he?
A. Yes.
Q. And, the dune has an effect [on] use and enjoyment of the area, has it?
A. It might be, and it has.
Finally, concerning loss of privacy Collins testified:
Q. Now, the fourth area is loss of value due to privacy. People walking up in front and down?
A. Yes.
Q. That's in the trough area, right?
A. Yes.

*635 Q. And, its your opinion that the second floor is adversely affected by that as well?
A. Yes.
Q. The second floor apartments can't even see anybody walking there, can they?
A. I'm sure
Q. Up on the second floor deck of this property, I don't see people waking down there, do I?
A. Well, why wouldn't you?
Q. Because you're elevated.
A. That means you can't see anybody?
Q. That's my question.
A. And the answer is, of course you can see people.
Q. Okay. And that results in a 10 percent loss of value? That's the allocation right?
A. Yes.
Q. Okay. What statistics did you use to come up with that? How many people walk by there on a given Saturday in July?
A. I didn't use statistics.
Q. Well, who did you talk to determine how many people walked by there?
A. I talked to hundreds of owners.
Q. In the 2800 block?
A. No.
Q. How many people did you talk to in the 2800 block?
A. I guess I talked to about half a dozen owners.
Q. And how pervasive is this problem people walking by there?
A. It's an irritation.
Q. An irritation?
A. Yes.
Q. And that irritation resulted in loss of value on the fabulous gold coast?
A. Yes, to this property.
Collins stated that the "the highest and best use for that easement area would be to provide an open beach so that people could use it, enjoy it, and provide an unobstructed view of the water and the strands in either direction."
Collins compared properties which, in his opinion, were similar in location, size, shape, fashion and demand to the condominium, both before and after the taking. For his "before" calculations he used "properties that were sold with absolutely no loss of view, no loss of access, no loss of use and no loss of privacy to determine the value before the taking." For his "after" calculation, he examined similar properties, "[b]ut they suffered from a loss of view, loss of direct access, loss of privacy... loss of use of the property in front." He actually used 2827 Wesley Avenue (the second floor condominium) as a comparable because it was sold, at a loss, prior to trial but after the dune had been erected. Regarding the date of his valuation, Collins testified:
Q. By the way Mr. Collins, what is the date of this valuation?
A. The date of this valuation was May 28, 1996.
Q. What is the date of taking.
A. I'm not entirely sure on that.
Q. What is the date of taking?
A. I'm not entirely sure on that date of taking.
Q. I'm asking you, do you know what a date of taking is in a condemnation proceeding?
A. Not exactly.
Q. Well, what's your understanding?
....
A. I don't know.
Q. Now, your appraisal report is dated May of 1996, is that correct?
A. Yes.
Q. And your expressing values as of May of 1996?
A. No.
Q. Okay. What date are you expressing the value on that?
A. The figures I gave were the difference between the before and after in *636 case of before the infringement of those loses versus afterward.
Q. I understand that.
A. I assumed that happened over a period of time.
Q. Well, I'm not asking what you assumed. You told these folks that the actions of condemning the easement resulted in $100,000 damages.
A. Yes.
Q. I want to know as of what date that $100,000 occurred. What is it?
A. I don't believe that occurred over one day?
Q. Over what period of time did it occur? Do you know?
A. I would say that would be over approximately two years.
Q. From what date to what date then? `94 to `96?
A. No.
Q. Okay.
A. I would say August 1992 until December of 1994. December 1994 was the date that I rendered my first opinion.
....
Q. Now getting back to the date, isn't it a good appraisal practice to identify the date for your evaluation? Isn't that the way appraisers do it?
A. Yes.
Q. Okay. Now we know you're not an appraiser, so what is the date that you established for this value of $100,000. We have to have a date, don't we?
A. No.
Q. We don't?
A. I did not have date.
Q. Okay, Now, you don't have date but don't good appraisal practices require the expert to say there's a date on which this damages occurred?
A. Yes.
Q. Okay. So we can agree there should be a date.
A. No, I didn't say that.
Q. Okay. There should not be date?
A. I didn't say that either?
Q. What did you say?
Q. I said, my value was not based on a date. Obviously the occurrence took place over a long period of time. The creation of the dune and problem that I am testifying to as to the loss of value.
Q. So you're not telling us that the $100,000 diminution is of any date?
A. I'm not saying that.
Q. Okay.
A. I'm saying I don't know what the exact date of that diminution in value is.
Q. Okay, And you don't know what relevance, if any, it has to a date of taking because you don't know what a date of taking is?
A. I don't know what "the" date of taking is.
Louis Spadaccino[3] testified regarding the actual riparian grant governing the property which was sold to a predecessor in title, "and to her heirs and assigns forever," in 1902 by the Governor and other "riparian Commissioners." The grant was for "all that parcel of land flowed by the tide water," and accurately described the plot of land. He also addressed the critical importance of the view of the ocean and access to the beach when he purchased the property. He described the privacy he enjoyed before the dunes were built that was quite distinct from the funneled walkway now directly past his deck. The walkway, built for the public to traverse the dunes, causes a steady stream of "pedestrian" traffic. The Spadaccino's daughter-in-law testified concerning the importance of the view for a mother; she used to allow her children to play on the *637 sand because she could easily watch them from the deck. She can no longer do so.
At the close of the case, the City moved to strike Collins' testimony because his valuation was not related to a specific date and not connected to the date of the taking, which was January 27, 1993. Thus, the City argued, the condominium presented no testimony on valuation. Judge Callinan denied this motion.
I am satisfied [that the] real thrust of [this] motion is that a witness who testifies as to value in a condemnation case must refer that value to the date of taking. That is the operative date of which the values are relevant.
And if Mr. Corcoran prevails on that motion the jury goes home without deciding the case. Because the only thing that is left without Mr. Collins' [testimony] is no testimony as to value that's helpful to the defendant.
It is clear to this court that the date of taking, at least as I understand the operative date of taking, is going to be January 27, 1993. And the testimony of Mr. Collins as to value was vague as to the date of taking and I don't think he understood the concept of the filing of the declaration of taking. Nor do I think that he knew the actual date of taking. Whether he knew the concept or not or whether he was not instructed to target his report to a specific date.
But, since the concepts that he relied upon were relevant, at least temporally to the time frame in dispute here. And, since he basically referred his time frame to `92, `93 area in his testimony and according to my notes, I'm going to allow his testimony not to be stricken, but I willand I don't agree that the remedy where there is no reference to the declaration of taking time is the weight that is attributed to the opinion. I don't believe it goes to weight. I believe it goes to admissibility. So, I acknowledge that admissibility is the issue here. But, I find that I have sufficient anchors in the testimony to the time frame relevant to the taking to allow the testimony to stand.
The City then moved to bar jury consideration of "loss of access" and "loss of view," urging that the access and view had not been lost, but simply altered. Judge Callinan denied this motion as well.
... [I]n the case of a riparian right, you have access to the property and you own the property. It's not that you're going out to a highway owned by a public entity, or by the public at large. You are the owner of the subject property.
And don't get me wrong. I have no problem with the State or Federal government saying there are overwhelming and overriding concerns that will limit your access, for example, the protective dune. But, under the facts of this case loss of access is a factor the jury may consider.
The jury returned a verdict of $1.00 for the easement; $37,000 for severance damages. On March 24, 1998, this judgment was incorporated into an Order for $37,001 plus accrued interest from January 1993.
The City made a motion for a Judgment Notwithstanding the Verdict, or in the alternative, a new trial. On May 4, 1998, the judge denied this motion and issued a letter opinion. He concluded that, although the defense expert did not key his testimony precisely to the date of taking, his evidence was temporally relevant to that date and satisfied the statutory and common law mandates in light of the continuous changes in the topography of the dunes from the time of taking to trial; that the defense expert's evidence was not based upon conjecture but on facts sufficient to warrant its admission; that the evidence, in fact, supported a loss of beach view and access; and that such a loss is compensable.
The City appeals contending that Collins' testimony was inadmissible and that, in any event, because reasonable access and view of the beach remained after the *638 taking, defendant did not suffer a compensable loss. We disagree and affirm.

I
There was evidence to support the conclusion that defendants lost their ocean view, beach access, and privacy. As to the adequacy and admissibility of that evidence, some comments are in order. N.J.S.A. 20:3-30 provides:
[j]ust compensation shall be determined as of the date of the earliest of the following events: (a) the date possession of the property being condemned is taken by the condemnor in whole or in part; (b) the date of the commencement of the action; (c) the date on which action is taken by the condemnor which substantially affects the use and enjoyment of the property by the condemnor which substantially affects the use and enjoyment of the property by the condemnee....
Professor Nichols has stated in his leading treatise on the law of eminent domain that
[i]t is critical that the appraisal performed by both parties reflect the date of valuation. Failure to appraise according to the correct date of value may give rise to a motion to strike the appraisal, or the reversal of the entire verdict.
[5 Nichols, Eminent Domain, § 18.16 (3d ed.1998) (footnote omitted).]
The City argues on appeal that the trial judge erred by allowing the jury to consider Collins' testimony because he "did not know the [statutory] date of taking and, did not relate his opinion to the [statutory] date of taking." As the City points out, "it is undisputed that the [statutory] date of taking occurred when the condemning authority filed its declaration of taking on January 27, 1993." See N.J.S.A. 20:3-30(b).
As of that date, however, work on the beach restoration project, including the construction of dunes within the easement taken, had only just begun. The undisputed evidence of record, including both testimonial and photographic, demonstrates that the size and height of the dune constructed along the front of the subject property, within the easement taken, continued to grow throughout the duration of the beach restoration project from late 1992 until early 1995. Thus, the adverse impact of the dunes on the defendants' right to an unobstructed view of and access to the ocean and, hence, the amount of the severance damages occurring as a result of the taking, could not be calculated with any degree of accuracy or fairness as of the statutory date of taking.
As a consequence, Chip Collins related his testimony, not to "before and after" the statutory date of taking, but rather to "before and after" a period of time roughly corresponding to the beginning and end of the construction of the beach restoration project (approximately August 1992 until December 1994).
The City nevertheless has taken the position that the trial judge was constrained to exclude Collins' testimony on the ground that he failed to relate his opinion to the statutory date of taking, even though the use of that premature date as the date of valuation would have yielded an inaccurate measure of the severance damages and thereby denied the defendants the just compensation that is their due.
In so arguing, the City fails to acknowledge that use of the statutory date of taking as the date of valuation must yield to constitutional considerations. Thus, as Professor Nichols in his treatise on the law of eminent domain has admonished: "Care must be taken by the parties to ensure that strict adherence to the legal date of value does not create a valuation less or more than just compensation." 5 Nichols, supra, § 18.16. Similarly, it has been observed that
[t]his court is not solely bound by the provisions of N.J.S.A. 20:3-30 in determining the date of valuation. The benchmarks of eminent domain law are *639 the Just Compensation Clauses of the New Jersey and United States Constitutions. The selection of a valuation date is necessarily a component of just compensation, and that selection must comport with the constitutional mandate.
[New Jersey Sports & Exposition Authority v. Giant Realty Associates, 143 N.J.Super. 338, 350, 362 A.2d 1312 (Law Div. 1976) (citations omitted).]
Thus, as Judge Callinan recognized, arbitrary application of N.J.S.A. 20:3-30 to set the valuation date in this case as of the date the City's condemnation action was filed "is not required where application of the statute would result in unjust compensation to the property owner." Uvodich v. Arizona Bd. of Regents, 9 Ariz.App. 400, 453 P.2d 229, 235 (1969). See Board of County Comm'rs v. Delaney, 41 Colo.App. 548, 592 P.2d 1338, 1339 (1978) (statute requiring determination of valuation for severance damages as of the date of order of possession will not be applied strictly when the result would be "fundamentally unfair" to expropriated landowner); Orono-Veazie Water Dist. v. Penobscot County Water Co., 348 A.2d 249, 256 (Me.1975) (advocating that there are times when, in the interest of practicality, the valuation need not be as of the date of taking); Utah State Road Comm'n v. Friberg, 687 P.2d 821, 829 (Utah 1984) ("When valuation is fixed at a date prior to the actual taking and the value of the property increases during a prolonged condemnation proceeding so that the valuation does not reflect a fair valuation of the property and does not therefore constitute `just compensation,' the statute fixing the time of valuation is unconstitutional as applied."). Thus, "[t]o comport with constitutional requirements in a particular case, it is necessary ... to consider whether the protraction of judicial proceedings and other circumstances that affect the value of the land have had such an effect as to make a valuation as of a statutorily determine date unfair." Friberg, supra, 687 P.2d at 829. In other words, "the time as of which the evaluation of the property should be made must comport with the peculiar facts and circumstances of the case so as to assure the property owner compensation which is just, as contemplated by the Constitution." Uvodich, supra, 453 P.2d at 235.
Here, the undisputed testimony of Cyril Galvin was that the dune increased in height and width throughout the years in question.[4] A series of photos recorded that position. Moreover, Collins testified that the condemnation of the easement resulted in $100,000 in severance damages on the basis of "before and after" comparable sales studies, that, as Judge Callinan found, "show a dramatic decrease in surrounding property values between the beginning and end of the beach restoration project." Indeed, Collins testified on cross-examination that "[t]he figures I gave were the difference between the before and after in the case of before the infringement of those losses versus afterward" and that he "assumed that that happened over a period of time." In addition, Collins testified on cross-examination that the occurrence of the severance damages could not be pinpointed to a single day, but rather occurred over a "long" period, approximately two years in length, extending from August 1992 until December 1994.
In view of this evidence, Judge Callinan specifically found that "the market analysis and pictures presented by the defense show that the full effect of the City's taking on the defendant's property could not be determined with great accuracy until the restoration project was completed." He also noted that the beach replenishment project "involved a construction enterprise of some duration." Finally, he recognized that Collins "took the view that *640 the damage was ongoing during the construction timespan and the effect was to be judged on the completed project, that is, the elevation of the dunes ultimately constructed by plaintiff and the access to the beach eventually afforded defendant by plaintiff."
In view of these peculiar facts and circumstances, we are satisfied that Judge Callinan's determination that Collins' testimony was admissible because it was temporally relevant to the statutory valuation date is legally unexceptionable.

II
We also agree with Judge Callinan's conclusion that loss of ocean view and access are elements for which severance damages may be awarded. While no New Jersey case has had occasion to expressly render such a ruling, the application of the standards governing partial takings leads inevitably to this conclusion.
When the State takes private property for a public purpose under the provisions of the Eminent Domain Act of 1971, N.J.S.A. 20:3-1 to -50, the property owner is entitled to just compensation. State, by Comm'r of Transp. v. Silver, 92 N.J. 507, 513, 457 A.2d 463 (1983) (citing N.J. Const. art. I, ¶ 20). Where the whole of a property is taken, the measure of damages is the fair market value of the property as of the date of the taking, determined by what a willing buyer and a willing seller would agree to, neither being under any compulsion to act. Village of S. Orange v. Alden Corp., 71 N.J. 362, 368, 365 A.2d 469 (1976). However, where only a portion of a property is condemned, the measure of damages includes both the value of the portion of land actually taken and the value by which the remaining land has been diminished as a consequence of the partial taking. Silver, supra, 92 N.J. at 514, 457 A.2d 463. The diminution in value of the remaining property constitutes the "severance damages."
New Jersey cases have expressed the computation [of severance damages] in either of two ways.
In one group of cases it has been held that the measure of damages is the market value of the land taken plus the difference before and after the taking in market value of the remainder area. This concept of the measure of damages may be graphically illustrated by the following equation:
Value of land taken + (value of remainder area before takingvalue of remainder area after taking) = just compensation.
The second rule enunciated by some courts is the so-called "before and after rule," wherein the damages to the condemnee are computed as the difference between the value of the entire tract before the taking and the value of the remainder area after the taking. This approach is embodied in the following formula:
Value of entire parcel before taking value of remainder area after taking = just compensation.
[Ibid. (citing 4A Nichols, Eminent Domain § 14.23 (3d ed.1975)).]
In valuing the property remaining after a partial taking
an examination of all of the characteristics of such remaining property after the time of the taking, as opposed solely to facts in existence at or immediately before condemnation, is inescapable. Therefore, in the case of a partial taking, the market value of property remaining after a taking should be ascertained by a wide factual inquiry into all material facts and circumstancesboth past and prospectivethat would influence a buyer or seller interested in consummating a sale of the property.

[Id. at 515, 457 A.2d 463 (citations omitted) (emphasis added).]
Obviously, flexibility is the hallmark of such an inquiry because just compensation in a given case will depend on the character *641 and use of the property involved. See State, by Comm'r of Transp. v. St. John's Church, 142 N.J.Super. 568, 574, 362 A.2d 574 (App.Div.) ("In partial taking cases ... the landowner is entitled to be paid the value of the land taken, together with the diminution in value of the part that remains (severance value). Upon a taking of property the owner is only entitled to be paid for what he has lost."), certif. denied, 71 N.J. 531, 366 A.2d 686 (1976).
Here, the City argues that the jury based its award on non-compensable considerations, namely, loss of ocean view, beach access and privacy. We disagree. If a "wide factual inquiry into all material facts and circumstancesboth past and prospectivethat would influence a buyer or seller interested in consummating a sale of the property" is the standard, ocean view, beach access, use and privacy are fundamental considerations in valuing beachfront property.
Indeed every other jurisdiction which has considered this issue has held that loss of view, loss of access, loss of privacy and loss of use are compensable.[5] For example, in Pierpont Inn, Inc. v. State, 70 Cal. 2d 282, 74 Cal.Rptr. 521, 449 P.2d 737, 745-46 (1969), overruled on other grounds, Los Angeles County, Metro. Transp. Authority v. Continental Dev. Corp., 16 Cal.4th 694, 66 Cal.Rptr. 2d 630, 941 P.2d 809 (1997), the California Supreme Court held that a property owner's loss of view and access to the beach, resulting from a partial taking for freeway construction, were proper elements of severance damages. Like the City here, the appellant in Pierpont contended that the trial judge "erred in permitting the jury to consider the property's loss of view and relatively unrestricted access to the beach in determining severance damages." The California Supreme Court held:
Where the property taken constitutes only a part of a larger parcel, the owner is entitled to recover, inter alia, the difference in the fair market value of his property in its `before' condition and the fair market value of the remaining portion thereof after the construction of the improvement on the portion taken. Items such as view, access to beach property, freedom from noise, etc. are unquestionably matters which a willing buyer in the open market would consider in determining the price he would pay for any given piece of real property. Concededly such advantages are not absolute rights, but to the extent that the reasonable expectation of their continuance is destroyed by the construction placed upon the part taken, the owner suffers damages for which compensation must be paid.

These elements of damages mentioned by the witnesses are not claimed by respondents as special damages, but are merely the reasons given by the experts for their opinions that the market value of the portion of the tract not taken would be diminished by reason of the taking of the 1/10-acre strip in front.... All of the matters mentioned were proper reasons to be advanced by the experts as bases for their opinions as to value.... Compensable items of severance damage, in fixing the fair market value of a remaining parcel, have been recognized to consist of impairment of light and air, impairment of view, invasion of privacy, and deprivation of access.
*642 [Id. 74 Cal.Rptr. 521, 449 P.2d at 746 (citations omitted) (emphasis added).]
See also, Pierpont, supra, 74 Cal.Rptr. 521, 449 P.2d at 746 ("Items such as view, access to beach property, freedom from noise, etc., are unquestionably matters which a willing buyer in the open market would consider in determining the price he would pay for ... real property.... [T]o the extent that the reasonable expectation of their continuance is destroyed by construction placed upon part taken, this owner suffers damages for which compensation must be paid."); La Plata Elec. Assoc. v. Cummins, 728 P. 2d 696, 696-97 (Colo. 1986) ("[A] property owner is entitled to present evidence concerning, and receive compensation for, all damage to the value of the remainder resulting from a partial taking of real property," including "aesthetic damage and loss of view" of the city's skyline and mountains behind it.); Missouri Pacific R.R. v. Nicholson, 460 So.2d 615, 624-27 (La.Ct.App.1984), writ denied, 462 So.2d 185 (La.1985) (increased traffic and loss of direct access to the area farmed, as well as noise, vibration, dust, loss of view of the farmland and loss of tranquility, are cognizable severance damages when part of the land had been expropriated by the Railroad); State ex rel. State Highway Comm'n v. Hesselden Inv. Co., 84 N.M. 424, 504 P.2d 634, 637 (1972) (loss of view, impaired ingress and egress and circuitous indirect access, were compensable consequential elements of damages on partial taking); Dennison v. State, 22 N.Y. 2d 409, 293 N.Y.S.2d 68, 239 N.E.2d 708, 710-11 (1968) (where taking of portion of land for highway resulted in loss of privacy, seclusion and view, consideration of traffic noise, lights and odors as factors in determining the decrease in the value to the remaining property was proper); Purchase Hills Realty Assoc. v. State, 35 A.D. 2d 78, 312 N.Y.S. 2d 934, 936-37 (1970) (impairment or destruction of enhanced value due to a scenic view of a golf course, by an appropriation separating the remainder of the object from the view is compensable: "a view may be effectively impaired even though it may still be physically possible to see the object of the view. One cannot realistically contend that there has been no loss of view when that view must now be made across a new highway."), order aff'd, 30 N.Y. 2d 615, 331 N.Y.S.2d 41, 282 N.E.2d 127 (1972); Keinz v. State, 2 A.D. 2d 415, 156 N.Y.S. 2d 505, 507-08 (1956) (where landowner's lot fronted the shore line of the bay, and the state took a one foot strip of the lot which abutted the bay, the landowners were deprived of their riparian rights, including all access to the water and a pleasant view of the bay; reductions in value of lot due to impairment of view were required to be considered in determining compensation award to be made to landowners), appeal denied, 3 A.D. 2d 815, 161 N.Y.S.2d 604 (1957); South Carolina State Highway Dep't v. Touchberry, 248 S.C. 1, 148 S.E.2d 747, 749-50 (1966) (plaintiff's loss of view of his farmland and loss of breeze to the remainder of the property, are compensable severance damages after a partial taking); Butler v. State, 973 S.W. 2d 749, 757 (Tex.App.1998) (landowners, part of whose property was taken for construction of approach lanes to an elevated highway, could receive compensation for the diminution in value of the remaining property caused by creation of an "unattractive" "aesthetic view" from the remainder of the property).
We note that the City's reliance on "highway access" cases, to support its contention that defendant's loss of direct access to the beach is non-compensable, is misplaced.[6] While those cases make *643 clear that non-compensable, "reasonable access" remains even if it is inconvenient or indirect, they concern an abutting property owner's right of access to and from the public highway.[7] This case presents the claim of a property owner, not to a public highway or byway, but to his own property. Spadaccino established the existence of a riparian grant. Collins testified that the property has riparian rights, namely that "you not only own the portion of your property that your home is on, but you also own the beach all the way out to the water." Judge Callinan confirmed that "in the case of a riparian right... you own the property." Accordingly, any loss of the right of access can be compensated. See Board of Trustees of Internal Improvement Trust Fund v. Sand Key Assocs., 512 So.2d 934, 936 (Fla.1987) (riparian and littoral rights include "the right of access to the water" and "the right to an unobstructed view of the water"); Thiesen v. Gulf, F. & A. Ry. Co., 75 Fla. 28, 78 So. 491, 501 (1917) ("The common-law riparian proprietor enjoys [the] right [of ingress and egress], and that of unobstructed view over the waters, and in common with the public the right of navigating, bathing, and fishing.... "); Tiffany v. Town of Oyster Bay, 234 N.Y. 15, 136 N.E. 224, 225 (1922) ("[R]ights of reasonable, safe, and convenient access to the water ... commonly belong to riparian ownership.").
In short, we are satisfied that the judgement entered upon the jury verdict could have been reached upon the evidence presented and that the judge properly rejected the City's motion for a new trial.
Affirmed.
NOTES
[1] During trial all defendants except 2825 Wesley Avenue Condominium settled their claims.
[2] Although rights incident to ownership of land abutting a sea, lake or pond are commonly referred to as riparian rights, they are technically "littoral rights"; "riparian rights" are only those incident to ownership of land contiguous to and abutting flowing, navigable waters such as streams or rivers. Black's Law Dictionary (4th ed.1968). See also Sand Key Assocs. v. Board of Trustees of Internal Improvement Trust Fund, 458 So.2d 369, 370 n. 1 (Fla.Dist.Ct.App.1984), approved, 512 So.2d 934 (Fla.1987) (explaining the same fact). Because all of the witnesses used the term "riparian," we will use it in this opinion.
[3] At trial, there was a question about who owned 2825: the condominium association or the Spadaccinos and the second floor tenants. The judge found that the Spadaccinos owned the property for purposes of the case. In any event, he held that simple reference to "the property owner" would suffice for the jury's sake.
[4] In fact, Galvin testified that the dune will continue to "increase markedly in coming years because of the trapping-vegetation growth and trapping of the sand from the newly widened beach."
[5] A distinction must be drawn between damages resulting from an obstruction on adjacent land and damages resulting from a partial taking of the defendant's land. A landowner is not entitled to severance damages to his property resulting from the taking of neighboring lands. State, by Comm'r of Transp. v. Weiswasser, 149 N.J. 320, 344, 693 A.2d 864 (1997). Instead, damages are only appropriate when the remainder property is damaged by a partial taking of the subject land. Ibid. Thus, the "critical factor... in determining ... compensable element[s] of damages in a partial-taking condemnation, is whether the loss arises from changes occurring on the property taken." Ibid.
[6] It seems to be agreed in New Jersey, as elsewhere, that in the absence or denial of all highway access, "[t]he general rule is that the property owner is not entitled to access to his land at every point between it and the highway but only to `free and convenient access to his property and the improvements on it.'" Reasonable highway regulations will not give rise to a claim for compensable taking. This doctrine has been summarized: "[A]n owner of land abutting a highway may not be shut off from all access thereto, but his right of access must be consonant with traffic conditions and reasonable and uniform police requirements." "[L]imitation of access, so long as reasonable access to the highway system remains, is not a taking by eminent domain, but is accomplished under the police power, and is not compensable."

[High Horizons Dev. Co. v. Dept. of Transp., 120 N.J. 40, 48-49, 575 A.2d 1360 (1990) (citations omitted).] Access to a public highway is a property right and its deprivation requires just compensation.... Where, by virtue of state action, access is limited but remains reasonable, there is no such denial of access as entitles the landowner to compensation.... Nor is a landowner entitled to compensation by virtue of inconvenience caused by the need to follow a more circuitous route.
[State v. Charles Invest. Corp,, 143 N.J.Super. 541, 544-45, 363 A.2d 944 (Law Div. 1976), aff'd o.b., 151 N.J.Super. 14, 376 A.2d 534 (App.Div.1977), aff'd o.b., 76 N.J. 86, 385 A.2d 1227 (1978).]
See also State v. VanNortwick, 260 N.J.Super. 555, 558-59, 617 A.2d 284 (App.Div.1992) (diminution of access to abutting property from a public highway is not per se compensable).
[7] Some also involve the fundamental issue of whether a taking occurred at all. Here that question was not contested.