842 A.2d 315

STATE OF NEW JERSEY, BY THE COMMISSIONER OF TRANS-PORTATION, PLAINTIFF–APPELLANT, v. SIMON FAMILY ENTERPRISES, L.L.C.; 1364 BLACK HORSE PIKE CONDO-MINIUM ASSOCIATION, INC.; EMMA GRASSO; MARTIN HAMSON; TOWNSHIP OF EGG HARBOR, IN THE COUNTY OF ATLANTIC, A MUNICIPAL CORPORATION OF NEW JERSEY, DEFENDANTS RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued September 22, 2003—Decided March 5, 2004.

244

Before Judges HAVEY, FALL and HOENS.

*Stuart A. Brooks* argued the cause for appellant (*Peter C. Harvey*, Attorney General, attorney; *Patrick DeAlmeida*, Deputy Attorney General, of counsel and on the brief with *Mr. Brooks* ).

*Peter H. Wegener* argued the cause for respondents (*Bathgate, Wegener & Wolf,* attorneys; *Mr. Wegener,* of counsel and on the brief).

The opinion of the court was delivered by

HOENS, J.A.D.

Plaintiff, State of New Jersey, by the Commissioner of the Department of Transportation, appeals from a judgment entered following a jury verdict awarding defendant Simon Family Enterprises, L.L.C. compensation for a partial taking of a tract owned by Simon and from an order denying a new trial on that complaint in condemnation. We affirm.

The facts relevant to the dispute are as follows. Late in 1994, officials from Atlantic County approached Sydney Simon of Simon Family Enterprises, L.L.C. in furtherance of an effort to purchase a portion of a tract of land Simon owned in Egg Harbor Township. The property in question is bordered by State Highway Routes 40 and 322 (Black Horse Pike) on the southeast and County Route 563 (Tilton Road) on the northwest. Tilton Road is comprised of one traffic lane in each direction and carries approximately 18,000 vehicles per day, while the Black Horse Pike is comprised of two traffic lanes in each direction and carries approximately 40,000 vehicles per day.

The Simon parcel included a small "out parcel" near the center, owned by a Mr. Roselle, which maintained an ingress/egress easement across the Simon tract to Tilton Road. There is a McDonald's restaurant directly to the south of the tract, a mobile home park directly to the north, and a mixture of homes, businesses and vacant lots along the two bordering highways opposite the Simon property. At the time, Atlantic County was beginning a road construction project that included the elimination of the nearby Cardiff traffic circle, a part of which plan included the creation of a connecting road between the Black Horse Pike and Tilton Road. Completion of that aspect of the project required the acquisition of a part of the Simon tract where the contemplated

connecting roadway would be built. For reasons not revealed in the record, negotiations stalled until the State became involved with the project approximately two years later.

The State and Simon then attempted to negotiate a mutually agreeable price for the sale of the subject portion of the property, estimated to be approximately one-third of the Simon tract. Those negotiations ended with the State's offer of $308,000 for the parcel, which Simon rejected. As the negotiations had failed, the State, through the Department of Transportation, filed a complaint in condemnation on May 5, 2000, followed by a declaration of taking, pursuant to which the State acquired 2.562 acres of the 9.713 acre tract owned by Simon on June 20, 2000. As required, at the same time the State deposited $308,000 with the court representing its evaluation of just compensation.

As part of the construction project, a new road, Uibel Avenue, was constructed on the eastern portion of Simon's tract, connecting Tilton Road with the Black Horse Pike. After the taking, the Simon parcel's available frontage on the Black Horse Pike was reduced from 953 feet to 553 feet and the available frontage on Tilton Road was diminished from about 477 feet to about 100 feet. In addition, the elimination of Cardiff Circle and the creation of the Uibel Avenue intersection reduced the possible use of the remaining Tilton Road frontage as a means of ingress to and egress from the tract by effectively eliminating sufficient distance from the tract to the intersection for safe ingress or egress of vehicles onto the roadway.

In September 2000, after the taking, Simon entered into a land purchase option agreement to sell the remainder of his tract to WAWA Incorporated ("WAWA"), for $325,000 per acre. The option agreement included a provision giving WAWA the right to terminate the agreement if the required permits and approvals it would need to develop the parcel for its purposes could not be obtained within 450 days. The permits and approvals WAWA needed related to creating a means of ingress to and egress from Tilton Road either by way of permit or additional property

acquisition. WAWA and Simon entered into a new option agreement, however, when WAWA could not arrange for the required approvals within the allotted time. That option extension fixed the price of the parcel at $322,000 per acre and included three additional option periods extending through December 15, 2002. The extension agreement, however, also obligated WAWA to take the parcel at the full price even if it could not obtain approval for a means of ingress to and egress from Tilton Road or purchase an adjacent property to provide that access. Prior to the trial on the condemnation complaint, WAWA obtained the development approvals from Egg Harbor Township and it purchased an adjacent tract of land from its owner, Mr. Barr, which provided it with full ingress to and egress from the site and Tilton Road. In the interim, on March 21, 2001, the court-appointed commissioners issued their report declaring just compensation for the taking. The commissioners considered the evidence presented by both parties and fixed compensation at $360,000 representing both the fair-market value of the taken portion of the tract and damages to the remaining property.

At the beginning of the trial, the judge ruled that evidence relating to the WAWA option contract was admissible in spite of the contingencies that contract contained but he excluded evidence relating to the Barr transaction and its effect on the value of the remaining tract. At trial, the jury heard both parties present expert testimony with respect to the highest and best use of the property and concerning the potential development proposals for the tract before and after the taking and they heard expert testimony about the fair market value of the property. The State's expert calculated just compensation to be $400,000, while Simon's expert arrived at a figure of $2,122,000. After a six-day trial, the jury returned a verdict of $1,710,000 consisting of $850,000 in compensation for the land that was taken and $860,000 representing damages to the remainder of the tract. The State's motion for a new trial was denied for reasons the judge expressed on the record on July 3, 2002.

On appeal, the State contends that the trial court erred in its analysis of the admissibility of evidence relating to the WAWA contract and the acquisition of the Barr property. The State argues that the trial court abdicated its role as the gatekeeper of evidence by improperly permitting Simon's expert to testify about a highest and best use of the property that was not financially feasible and in keeping from the jury evidence that would have demonstrated that the taking did not diminish the value of the remainder. Moreover, the State urges us to conclude that the jury's award was against the weight of the evidence. We address these issues in turn.

Each of the issues raised in this appeal relates to the admissibility of evidence and to the uses to which evidence may properly be put in the context of expert opinions offered in condemnation matters. Each, therefore, requires us to address not only the evidence in issue, but its role in the opinions offered by each of the experts and the uses of that evidence by those experts in the condemnation context.

The first issue on appeal, relating to the WAWA contract, raises an issue first addressed by our Supreme Court in *State by Comm'r of Transp. v. Caoili*, 135 *N.J.* 252, 639 *A.*2d 275 (1994), namely, the role of the trial judge as the gatekeeper of evidence to be considered by the jury in condemnation trials. The essential issue raised by the State in this regard is whether the WAWA contract could be essentially repudiated by Simon's experts as being irrelevant to any of the elements of the proofs in the condemnation proceeding.[1] In the State's analysis, this attempted repudiation of the post-taking contract by Simon's experts should have been kept from the jury as a part of the judge's gatekeeping function. We consider this novel question at some length.

---

[1] The WAWA contract was first offered by the State's expert for the purpose of demonstrating that the remainder of the site could still be profitably developed, that the post-taking value per acre of the remainder was essentially undiminished and that the highest and best use of that tract was for a particular type of commercial development.

We begin by reviewing the governing principles relevant to condemnation proceedings. . A private property owner is entitled to just compensation when his property is taken by the State for public use. *N.J.S.A.* 20:3–1 to –50; *State by Comm'r of Transp. v. Silver,* 92 *N.J.* 507, 513, 457 *A.*2d 463 (1983) (citing *N.J. Const.* art. I, ¶ 20). Where the entire property is taken, just compensation is "the fair market value of the property as of the date of the taking determined by what a willing buyer and willing seller would agree to, neither being under any compulsion to act." *Silver, supra,* 92 *N.J.* at 513–14, 457 *A.*2d 463. The fair-market value of a property, however, "is not limited to the actual use of the property on the date of taking but is, rather, based on [the property's] highest and best use." *County of Monmouth v. Hilton,* 334 *N.J.Super.* 582, 587, 760 *A.*2d 786 (App.Div.2000), *certif. denied,* 167 *N.J.* 633, 772 *A.*2d 935 (2001). Thus, although courts, in determining a property's fair-market value, consider all reasonable uses of the property, the appropriate analysis rests upon its highest and best use. *Caoili, supra,* 135 *N.J.* at 260, 639 *A.*2d 275; *see State v. Gorga,* 26 *N.J.* 113, 116, 138 *A.*2d 833 (1958).

Where only a portion of one's private property is taken by the State, the analysis is more complex. In that circumstance, the property owner is not only entitled to just compensation for the fair-market value of the portion that has actually been taken, but also for the diminution in the value, if any, of the remaining land, referred to as "severance damages." *City of Ocean City v. Maffucci,* 326 *N.J.Super.* 1, 18, 740 *A.*2d 630 (App.Div.), *certif. denied,* 162 *N.J.* 485, 744 *A.*2d 1208 (1999).

In the present case, the State condemned only a portion of the Simon property. Hence, Simon is entitled to just compensation for the portion taken together with any "severance damages" to the remaining land. The jury's award of $1,710,000 in damages represents $850,000 in compensation for the land taken and $860,000 in severance damages to the remaining portion. The State on appeal attacks both parts of the jury award.

First, the State contends that the award for the portion taken was based on Simon's expert architect, Thomas Sidrane's "three pad site" plan that was not financially feasible, and therefore was not based on the highest and best use of the property. Second, the State contends that, based on the terms of the WAWA agreement, Simon did not suffer any "severance damages" to the remaining property as a result of the partial taking, an argument that focuses on the testimony of Simon's appraisal expert, John P. Brody.

The first issue, then, is whether the trial judge erred in discharging his gatekeeping function respecting Simon's experts' evidence. In *Caoili, supra,* the Supreme Court formulated a two-step procedure against which the trial judge must test the admissibility of certain evidence. There, the Court addressed the question of whether and under what circumstances evidence of a potential future zoning change that could materially affect the value of condemned property would be admissible. The Court, recognizing that fair-market value is fundamentally based on an analysis of the property's highest and best use, and recognizing that the use must be analyzed in accordance with applicable zoning restrictions, 135 *N.J.* at 260, 639 *A.*2d 275, held that it might nevertheless be appropriate for the jury to consider a potential zoning change that would affect the uses to which the property could be put. *Id.* at 265, 639 *A.*2d 275. Before such evidence may be considered by the jury, however, the Court cautioned that the trial judge is required to determine whether the evidence "is sufficient to warrant a determination that such a change is reasonably probable." *Ibid.* In short, therefore, the Court required the trial judge to serve as the gatekeeper, screening the proffered evidence to ensure that the jury is not presented with speculative or remote possibilities that no reasonable prospective buyer would consider. *Id.* at 264, 639 *A.*2d 275. The role of the jury, thereafter, is to evaluate the effect that such a probability would have on the fair-market value of the property. *Id.* at 265, 639 *A.*2d 275.

We have, subsequent to the decision in *Caoili*, had the opportunity to consider the scope of the trial court's gatekeeper function in condemnation trials. We have applied the *Caoili* two-step procedure in circumstances where development impediments, including an existing sewer moratorium, necessitated governmental approvals, the absence of which limited the use of the property. *See Jersey City Redev. Agency v. Mack Prop. Co.*, 280 *N.J.Super.* 553, 566–67, 656 *A.2d* 35 (App.Div.1995). More recently, we have considered the application of the *Caoili* rule in the context of the potential for a future assemblage of property contiguous to the condemned property and its concomitant effect on the fair-market value of the subject tract. *Hilton, supra,* 334 *N.J.Super.* at 592–94, 760 *A.2d* 786. We there held that because the expert for the property owner valued the property as if the proposed assemblage of the adjacent parcels had already occurred, the opinion was speculative, particularly in light of the trial court's failure to properly charge the jury concerning the correct means of weighing the expert's opinion. In so holding, we reiterated the *Caoili* rule, and its predecessor opinion in *Gorga, supra,* 26 *N.J.* at 116–17, 138 *A.2d* 833, and explained the two-step process as follows:

> Thus, as we understand *Caoili,* the first step in the two-step trial process is for the judge to make an initial, gatekeeping determination of whether an assemblage was probable in the near future as measured from the date of taking based on the evidence before him relating to market conditions and the circumstances particular to the property.
>
> . . .
>
> If the judge determines that an assemblage including defendant's property was reasonably probable at a near-future time from the date of taking, then, according to the prescription of both *Gorga* and *Caoili,* the jury must be instructed to consider in its determination of fair market value the premium a willing buyer would pay for the probability of a future assemblage over and above the fair market value as represented by the existing use of the property. In making this determination, we are persuaded that a jury would have to determine the degree of probability of the assemblage since, as we have noted, the more probable the desired event is, the more valuable that probability is to a buyer and the greater the premium he would therefore be willing to pay. In this regard, we understand that what *Caoili* meant in the above quoted language respecting "an impact on the value of the property regardless of the degree of probability" was addressed to the court's gatekeeping function and not to the jury's determination. That is to say, the judge, in determining probability, need not determine degree of probability so

long as there is reasonable probability, but the jury may consider the degree of probability, as indeed it must, in determining the extent of the premium the buyer would be willing to pay.

[*Hilton, supra*, 334 *N.J.Super.* at 593–94, 760 *A.*2d 786.]

While we agree that, in general, trial judges are required to exercise gatekeeping functions to screen from the jury opinions of experts that are speculative, *see, e.g., Rubanick v. Witco Chem. Corp.*, 125 *N.J.* 421, 436, 593 *A.*2d 733 (1991), and to keep from the jury opinions that are not based on facts or standards, *see, e.g., Buckelew v. Grossbard*, 87 *N.J.* 512, 524–25, 435 *A.*2d 1150 (1981), we are not persuaded that the expert opinions challenged here required a analysis within the *Caoili* framework. The State asserts that the owner's proofs were fatally flawed because the owner's analysis of the highest and best use for the property prior to the taking was represented by a three-pad site commercial development plan. Sidrane, in consultation with Brody and with Simon's attorney, devised a proposed development plan for the site that would have included three pad sites, two located on the lesser-traveled Tilton Road frontage, and that would have created sufficient parking and ingress and egress routes, all of which would have been both permitted by all applicable zoning ordinances and technically feasible had the reconfiguration of the traffic circle not reduced the site's size and frontage. Brody then based his appraisal of the pre-taking fair-market value on that plan, resulting in his estimate of the loss to the owner. The State asserts that the trial judge erred in permitting Sidrane to opine that the three-pad site development was the highest and best use because the plan was not financially feasible and that the judge further erred by permitting Brody to rely on that plan while ignoring the actual post-taking development plan as represented by the WAWA option contract. We disagree.

■ Property owners are to be compensated for the property taken at "the fair market value of the property as of the date of the taking determined by what a willing buyer and willing seller would agree to, neither being under any compulsion to act." *Silver, supra*, 92 *N.J.* at 513–14, 457 *A.*2d 463. However, "the

inquiry [into the fair market value] is not limited to the actual use of the property on the date of taking but is, rather, based on its highest and best use." *Hilton, supra,* 334 *N.J.Super.* at 587, 760 *A.*2d 786. Highest and best use is "'the use that at the time of the appraisal is the most profitable, likely use' or alternatively, 'the available use and program of future utilization that produces the highest present land value' provided that 'use has as a prerequisite a probability of achievement.'" *Ibid.* (quoting *Ford Motor Co. v. Township of Edison,* 127 *N.J.* 290, 300–01, 604 *A.*2d 580 (1992)). Thus, the highest and best use is the use that is (1) legally permissible, (2) physically possible, (3) financially feasible, and (4) maximally profitable. *Hilton, supra,* 334 *N.J.Super.* at 588, 760 *A.*2d 786; *see Ford Motor Co., supra,* 127 *N.J.* at 304–05, 604 *A.*2d 580.

The State's challenge here focuses on financial feasibility, the third prong of the four-part test for determining highest and best use. The definition for financial feasibility adopted by the courts arises from the use of that concept by the Tax Court in its assessment determination. The relevant criteria are as follows:

> To determine the financial feasibility of potential income-producing uses, the appraiser estimates the future gross income that can be expected from each [use]. Vacancy and collection losses and operating expenses are then subtracted from each gross income to obtain the likely net operating income (NOI) from each use. A rate of return on the invested capital can then be calculated for each use. If the net revenue capable of being generated from a use is sufficient to satisfy the required rate of return on the investment and provide the requisite return on the land, the use is financially feasible.
>
> [*Entenmann's Inc. v. Totowa Borough,* 18 *N.J. Tax* 540, 546 (Tax 2000)(quoting Appraisal Institute, *The Appraisal of Real Estate* 305 (11th ed.1996)).]

■ While it is plain that the *Caoili* two-step analysis for admissibility of expert opinions is the appropriate mechanism for evaluating opinions as to highest and best use that themselves are based on a future zoning change, a future approval of a subdivision or a site plan, *see Caoili, supra,* 135 *N.J.* at 267, 639 *A.*2d 275, or a future assemblage of properties, that analysis does not apply directly to all expert opinions as to highest and best use. Although an expert's opinion as to highest and best use must include

an evaluation of financial feasibility, nothing in the *Caoili* analysis requires the judge to independently determine that the proposed development plan, otherwise permitted by the zoning ordinance, is also a plan reasonably probable to occur. Rather, as long as the opinions offered are not speculative or unreliable and do not fail as net opinions, *see Buckelew, supra,* 87 *N.J.* at 524–25, 435 *A.*2d 1150, they should be presented to the jury and tested through rigorous cross-examination.

Respecting the Sidrane and Brody opinions, we see no evidence in this record that the judge was unaware of his general gatekeeping role or that he failed to adequately discharge it. The essence of the State's argument is that Sidrane's proposal for three pad sites on the property as the measure of the pre-taking value was based on a plan that was not financially feasible, that his configuration of the proposed three pad sites was designed to create the illusion that the taking reduced the development potential of the site from three pad sites to one, and that Brody's opinion of just compensation, which was based on the Sidrane configuration, was effectively a repudiation of the WAWA contract's post-taking valuation of the site for a different development option. The State contends that in this way, Simon manipulated the evidence presented to the jury to create the false impression of a significantly higher loss due to the taking than the true loss, measured by the WAWA contract, to which Simon had knowingly and willingly agreed. We have carefully considered this argument and have concluded that it rests upon a fundamental misperception of the evidence, its admissibility, and the role of the judge as the gatekeeper.

First, there is no ground on which to conclude that Sidrane's opinion about the pre-taking development possibilities for the property was inadmissible. While the State contends that he lacked the qualifications necessary to offer the opinions represented by his three-pad site proposal and that the proposal itself was intentionally designed to create a false impression of the development possibilities for the tract, we do not agree. To the extent

that Sidrane had relatively less professional experience with pad site developments or with the development of tracts near this one, nothing in this record demonstrates that Sidrane lacked the knowledge, training, education or experience required to offer the opinion respecting potential development. *N.J.R.E.* 702. Rather, Sidrane's supposed shortcomings were fully explored in cross-examination and relate, in the end, only to the weight that the jury might give to his opinions.

Nor did the judge err in the admission of Sidrane's opinions into evidence as relevant to the highest and best use of the property. To begin with, all of the experts recognized that the property was essentially vacant land, as to which any proposed development was merely a proposal. Each of the experts addressed the ways in which the property might be developed consistent with the existing zoning requirements and Sidrane's three-pad proposal was simply one conceptual plan intended to demonstrate development that might have been undertaken. More to the point, his testimony concerning that proposal was specific with respect to the conceptual nature of the plan.

Respecting financial feasibility, the prong of the highest and best use test that the State asserts the trial judge failed to adequately address, the potential for and feasibility of development of the property in accordance with the three-pad site plan was addressed by Brody in his appraisal of the tract. While the State contends that there was no evidence of the financial feasibility of the three-pad site plan, and while the State in particular contends that the decision by Sidrane to locate two of those sites on Tilton Road was a fiction designed to maximize the loss due to the effect of the taking on access from Tilton Road, the record does not support either contention. Unlike *Caoili* and *Hilton,* there was no zoning or other impediment to the plan as envisioned by Sidrane. As a result, the judge was not required to engage in the analysis of whether the plan was based on reasonable probabilities. Rather, the decision concerning the admissibility of the opinions was in the nature of the usual gatekeeping functions

performed by the trial judge. Moreover, respecting financial feasibility, there was sufficient evidence in this record that the development plan would have been feasible to permit the evidence to be presented to the jury.

Nor are we persuaded that Simon in any sense ignored or repudiated the contrary evidence about the property's highest and best use as represented by the WAWA contract. The State contends that the WAWA contract proves that the highest and best use of the property after the taking was more valuable than the post-taking analysis based on the Sidrane configuration would have led the jury to believe. The State therefore argues that Simon should not have been permitted to argue that the highest and best use of the property was anything other than the use represented by the WAWA contract and that the jury should not have been permitted to consider the other conceptual analysis offered by Sidrane. We disagree. Far from repudiating the WAWA contract, Simon's expert directly addressed the relevance of that contract as a part of his opinion. More to the point, the WAWA contract was, at the time of the trial, only an option which WAWA had the right to exercise under certain conditions and the relevance of which for purposes of establishing fair-market value was indirect at best. Notwithstanding that limitation on the evidence, the simple fact is that the WAWA contract was admitted into evidence and its terms and effect were considered by the jury as a part of the evidence bearing on the issues of the highest and best use of the property and its value post-taking.

The State next contends that the trial judge erred in excluding the evidence relating to the so-called Barr contract. One of the principal effects of the partial taking on the Simon tract was that the usable frontage on Tilton Road was greatly reduced. The reduction in frontage, coupled with the creation of the new inter-section, virtually eliminated the possibility of creating a means of ingress to and egress from the site onto that roadway. The first WAWA contract recognized the effect of that reduction by includ-ing the contingency which would permit WAWA to void the

contract if a means of ingress and egress could not be arranged. Two possible solutions were considered. One option would have required the negotiation with the township and the State for permission to position a driveway leading onto the site from Tilton Road which would be closer to the intersection than ordinarily permitted. The alternative option would have required the acquisition of an easement or the purchase of a portion of a tract of land adjoining the Simon tract then owned by Barr which would be used to create the means of ingress and egress without further permission. Prior to the trial, WAWA acquired the Barr tract, which, the State argued, should have been evidence admitted for consideration by the jury in mitigation of the damages Simon claimed.

We first note that the trial court's determinations concerning the admission of evidence are not to be disturbed in the absence of a showing of a clear abuse of discretion. *Green v. N.J. Mfrs. Ins. Co.*, 160 *N.J.* 480, 492, 734 *A.*2d 1147 (1999). In addition, although a broad scope of cross-examination is permitted in connection with the determination of the highest and best use of a property in a partial taking, the precise parameters of cross-examination are similarly left to the trial court's discretion and are reviewed under the same standard. *Casino Reinvestment Dev. Auth. v. Lustgarten*, 332 *N.J.Super.* 472, 492, 753 *A.*2d 1190 (App.Div.), *certif. denied*, 165 *N.J.* 607, 762 *A.*2d 221 (2000).

The State relied on *N.J.S.A.* 2A:83–1 in support of its argument that the Barr transaction should be admitted. We disagree with this analysis. The cited statute merely abolished the hearsay rule to allow admission into evidence of comparable sales through a witness who did not participate in the sales and who otherwise could not adduce direct proof of such sales. *White v. State Bd. of Tax Appeals*, 123 *N.J.L.* 350, 8 *A.*2d 819 (1939). The statute does not, however, require the court to admit any and all contracts into evidence. In particular, as the Barr contract was not offered for consideration as a comparable sale, the statute is irrelevant to its admissibility.

The State, nevertheless, contends that the nature of this statute is remedial and that it must therefore be construed liberally to reflect the spirit of the law in circumstances not contemplated by the drafters. *See City of Newark v. Township of Hardyston*, 285 *N.J.Super.* 385, 667 *A.2d* 193 (App.Div.1995), *certif. denied*, 143 *N.J.* 518, 673 *A.2d* 277 (1996). We see, however, nothing in the purpose or meaning of this statute so broad as to permit proof of mitigation of damages due to an owner by way of the acquisition of land by a third party who purchased the remaining property after a partial taking. Therefore, the argument that the Barr transaction should be admitted based on *N.J.S.A.* 2A:83–1 is without merit and the trial judge acted within his discretion in excluding that evidence. *N.J.R.E.* 403.

■ Nor do we agree with the State's contention that the Barr transaction could negate the damages to the remaining Simon property. First of all, the purchase of the Barr property was undertaken by a third party, WAWA, whose option contract with Simon to purchase Simon's remaining land had not been completed. The severance damages at issue in this case were for Simon, not WAWA. Therefore, WAWA's acquisition of the Barr property is irrelevant and cannot serve as evidence in mitigation of damages to Simon's remaining property.

Second, the State took slightly over 400 feet of the 953–foot frontage along the Black Horse Pike and left between 90 and 95 feet of frontage out of the original 477.24 feet fronting on Tilton Road. Therefore, after the taking, Simon's property lost 42% of its frontage on the Black Horse Pike and 81% of its frontage on Tilton Road. Loss of access is among the elements we have recognized as compensable severance damages. *Maffucci, supra*, 326 *N.J.Super.* at 20, 740 *A.2d* 630. The Barr property could not serve as "replacement frontage" for the Tilton Road side of the Simon property in any event. All of the experts agreed that after the taking there was very limited potential for commercial development on the Tilton Road side of the tract. WAWA's plan for the remainder of the Simon land involved development of a Gas–

N–Go on the Black Horse Pike side of the property. The addition of the Barr property, which was used only to create an alternate access route to the remaining property from Tilton Road, could not affect the value of the Simon land because it would not create any flexibility for the WAWA design and its internal traffic circulation.

Third, a part of the judge's reasoning for excluding the Barr contract from evidence was his concern that there was a relationship between Barr and WAWA such that the agreement might not be an arms-length transaction. All of that being undisputed, we agree with the trial judge that the evidence of the Barr transaction was "without ... relevance ... unduly prejudicial, and potentially confusing." *See N.J.R.E.* 403.

Finally, the State argues that the verdict should be overturned on the ground that it is against the weight of the evidence. Again, we disagree. In evaluating this issue, we generally defer to the trial court's determination of the "intangibles" not evident from the trial record, including the court's assessment of the credibility of the witnesses and the so-called "feel of the case," but we undertake to make our own independent evaluation of the ultimate issue of whether a miscarriage of justice has occurred. *See Carrino v. Novotny,* 78 *N.J.* 355, 360–61 n. 2, 396 *A.*2d 561 (1979); *Baxter v. Fairmont Food Co.,* 74 *N.J.* 588, 597–98, 379 *A.*2d 225 (1977); *Dolson v. Anastasia,* 55 *N.J.* 2, 6–8, 258 *A.*2d 706 (1969). The record before us demonstrates that the trial judge carefully considered the arguments urged upon us by the State in the context of the motion for a new trial and that he explained the reasons for his decision to reject them. Our independent evaluation of the record compels us to do likewise.

The jury heard and considered the competing views of the experts called by the State and Simon, each of them tested through vigorous cross-examination. In that process all of the evidence concerning the potential development, the highest and best use of the property, and the valuations pre- and post-taking were weighed and considered and the determination of the jury is

based on ample evidence in the record. Far from the conclusion urged upon us by the State that the verdict was the product of manipulation of data, confusion or prejudice, we perceive, as did the trial judge, a verdict carefully based on the evidence and testimony and we will not therefore disturb it.

Affirmed.