CREEK RANCH, INC., PLAINTIFF-APPELLANT, v. NEW JERSEY TURNPIKE AUTHORITY, DEFENDANT-RE-SPONDENT.

Argued October 3, 1977—Decided February 16, 1978.

422

Mr. *Daniel J. Carluccio* argued the cause for appellant (*Messrs. Citta, Carluccio and Holzapfel,* attorneys).

Mr. *Bernard M. Reilly* argued the cause for respondent (*Mr. Herbert I. Olarsch,* attorney).

The opinion of the court was delivered by

SCHREIBER, J. The plaintiff, a property owner, instituted this action against the New Jersey Turnpike Authority (Authority) for breach of a contract allegedly made in anticipation of a project to construct an expressway between

the New Jersey Turnpike Interchange 9 in the New Brunswick area and Toms River. The proposed route would have necessitated a taking of part of the plaintiff's land located in Toms River. The Authority sought and received a Right of Entry Permit from plaintiff. When the expressway project was abandoned, the Authority attempted to void the permit. Plaintiff refused to release its rights and instituted this action to recover the sum allegedly promised in the permit. The Authority's motion for summary judgment, predicated on the concept that no contract had come into being, was granted by the trial court. On appeal, the Appellate Division affirmed, one judge dissenting. The plaintiff appealed as of right to this Court pursuant to *R.* 2:2–1(a).

The following factual picture emerges from the pleadings and affidavits submitted on the summary judgment motion. After surveying the plaintiff's property which was to be used for the proposed expressway, the Authority made nine test borings on the land on six different days in July and August 1973. On November 12, 1973 the Authority's Manager of Right of Way wrote the following letter to the plaintiff:

Your property will be affected by the construction of the Governor Alfred E. Driscoll Expressway and will be needed no later than April 1, 1974.

Enclosed please find Right of Entry permit form which entitles you to 8% from the date of signing until an agreement has been reached by negotiations. In addition, the Authority will pay the property taxes on the affected property to be acquired from April 1, 1974 until final settlement date. May I reiterate that the 8% is over and above the final settlement price.

If this agreement meets with your approval, please sign, date and return to:

> New Jersey Turnpike Authority
> 8 Robbins Street
> Toms River, N. J. 08753

The enclosed printed Right of Entry Permit form in which the property description was inserted read as follows:

NEW JERSEY TURNPIKE AUTHORITY
(201) 247-0900 New Brunswick, N. J. 08903
RIGHT OF ENTRY PERMIT

IN CONSIDERATION of the sum of one dollar ($1.00) and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned, hereinafter called the "Owner" grants to the New Jersey Turnpike Authority, hereinafter called the "Authority" a permit upon the following terms and conditions:

1. The owner hereby grants to the Authority an irrevocable right to enter upon the lands hereinafter described in order to carry out the construction program of the Authority; to include but not be limited to surveys, clearing, grading, drainage and the erection of structures or other improvements.

2. All tools, equipment, buildings, improvements and other properties placed upon the land by the Authority or its contractors and/or agents shall remain the property of the Authority, its contractors or agents, as the case may be, and may be removed by the Authority, its contractors or agents at any time within a reasonable period after the termination or expiration of this permit.

3. The Authority recognizes the co-operation of the owner in granting this voluntary entry, and will proceed promptly to obtain reports and appraisals so that negotiations may be instituted quickly, looking to a settlement, based upon a fair and just price to be paid to the owner.

4. The lands affected by this permit are located in the State of New Jersey, County of Ocean, and are described as follows: DE1B–31

As shown on preliminary map of Governor Alfred E. Driscoll Expressway by Sanders and Thomas, Inc., consisting of 32.02± acres further defined as Block 298, Lots 15, 16, 17, & 38, Dover Township.

The Authority agrees to pay interest, at the rate of 8%, on the value of the lands herein described, as ultimately agreed upon, either by negotiations, resulting in an Agreement To Convey; or the results of the ultimate award in condemnation; between the time of execution of this Right of Entry Permit and the time possession ceases; or the Authority and the Owner enter into a contract of purchase; or in the alternate, the Authority institutes condemnation proceedings.

WITNESS My Hand and Seal this ........ day of ........ 19....

Plaintiff acted promptly. On November 20, 1973, its Board of Directors accepted the proposal and formally "[r]esolved that the corporation enter into a Right of Entry Permit Agreement with the New Jersey Turnpike Authority in accordance with a copy attached hereto and made a part

hereof, which is self-explanatory." The president and secretary were authorized to execute the permit and affix the corporate seal. The permit was then fully executed, acknowledged and returned to the Authority.

The expressway project was stalled by litigation commenced by the Townships of South Brunswick and Monroe. The townships prevailed because of the Authority's failure to obtain a necessary environmental impact statement. *Township of So. Brunswick v. N. J. Turnpike Auth.*, 129 *N. J. Super.* 126 (App. Div.), certif. den. 66 *N. J.* 334 (1974). Thereafter, the Authority elected not to seek that statement and abandoned the project.

Approximately one year after obtaining the Right of Entry Permit, the Authority sent the following letter dated November 25, 1974, to plaintiff's counsel:

Our records indicate a Right-of-Entry providing for payment of interest contingent upon Authority. occupancy, acquisition, and final settlement was executed concerning the above-captioned property. Due to legal and executive developments concerning the expressway project, the Authority is not in a position to occupy or acquire this property at this time or in the near future. Due to the present and future uncertainty as to the expressway project and the legality of any acquisition and, further, the potential effect of the Right-of-Entry on the date of valuation under *N. J. S. A.* 20:3-20 in any future acquisition, it is appropriate for both parties that the Right-of-Entry be hereby voided and of no force and effect and any rights or obligations of either the owner or the Authority potentially arising be nullified.

Would you kindly acknowledge this understanding on the attached copy of this letter and return to the undersigned; an acknowledged copy will be returned to you within seven (7) days. In the event the Authority does not hear from you within fifteen (15) days, said Right-of-Entry shall be considered nullified and voided and of no force and effect.

Thank you for your cooperation in this matter.

Very truly yours,
/s/ Herbert I. Olarsch
Herbert I. Olarsch
Senior Attorney

I hereby acknowledge and agree to the above understanding voiding this Right-of-Entry.

Plaintiff refused to execute the understanding and instituted this action seeking damages for breach of contract. During the oral arguments before the trial court and this Court, plaintiff claimed that its damages consisted solely of the loss of 8% of the value of the land between the execution of the Right of Entry Permit in November 1973 and its cancellation in November 1974. The trial court granted the defendant's motion for summary judgment because the 8% "was due on the closing of the transfer of the title" which did not occur because the Authority chose not to proceed. The Appellate Division's affirmance was bottomed on the finding that no binding agreement ever came into being because a condition precedent thereto, namely the fixing of a price for the land, either by agreement or in a condemnation proceeding, never occurred. It reasoned that the Right of Entry Permit represented at best only an offer by the plaintiff which had never been accepted by the Authority. Furthermore, it reasoned that no consideration passed to the Authority because the entry permit merely authorized the Authority to do what it was already empowered to do under *N. J. S. A.* 20:3–16.

Judge Crane dissented. He stated that a contract was formed when the plaintiff executed and returned the Right of Entry Permit, that the Statute of Frauds appeared to be satisfied by the letter of November 12, 1973, and that it was inappropriate to grant summary judgment on the meager record. We agree with the dissenting opinion and reverse and remand for a plenary trial on all issues.

The Authority urges that its November 12, 1973 letter and the enclosed Right of Entry Permit constituted only a solicitation of an offer and that the plaintiff's execution of the permit constituted an offer which the Authority never accepted. The proposition that an offer was solicited must be examined from the viewpoint of the recipient of the letter and permit. Would the plaintiff know or have reason to know that the Authority did not intend the letter and enclosure to be an expression of a fixed purpose in the absence of a

further expression of the Authority's assent? *See Restatement, Contracts,* § 25 (1932). Or putting the proposition affirmatively, would the recipient reasonably be led to believe that the power to create a contract had been conferred on it? Professor Corbin has drawn the distinction between an offer and a solicitation in the following language:

What kind of act creates a power of acceptance and is therefore an offer? It must be an expression of will or intention. It must be an act that leads the offeree reasonably to believe that a power to create a contract is conferred upon him. This applies to the content of the power as well as to the fact of its existence. It is on this ground that we must exclude invitations to deal or acts of mere preliminary negotiation, and acts evidently done in jest or without intent to create legal relations. All these are acts that do not lead others reasonably to believe that they are empowered "to close the contract." So long as it is reasonably apparent that some further act of the offeror is necessary, the offeree has no power to create contractual relations by an act of his own, and there is as yet no operative offer. [1 *Corbin, Contracts,* § 11 at 25 (1962) (footnote omitted)]

*See also Broad St. Nat. Bank of Trenton v. Collier,* 112 *N. J. L.* 41, 43–44 (Sup. Ct. 1933), aff'd o. b. 113 *N. J. L.* 303 (E. & A. 1934); *First Pres. Church, Newark v. Howard Co.-Jewelers,* 12 *N. J.* 410, 414 (1953). Viewing the letter and permit most favorably from the property owner's frame of reference under the circumstances, one could reasonably conclude that an offer was being made.

The Authority's contention that it was only inviting an offer does not square with its literature. Nowhere in its November 12, 1973 letter is there any language suggesting that it is seeking an offer. Rather, the letter expressly advised the property owner that the land would be needed in approximately four months. It sought immediate execution of the Right-of-Entry Permit and advised the property owner it would be entitled to 8% from the date of signing until the negotiations were completed. Further, the letter emphasized that the 8% was over and above the price to be fixed for the land. The letter concluded by advising that "[i]f this

*agreement* meets with your approval, please sign, date and return * * *." (Emphasis supplied). It would be difficult to construct a letter which more directly poses an offer and seeks its acceptance. The terms of the "agreement" referred to by the Authority in the final sentence were clearly not to be proposed by the plaintiff, but instead were contained in the Right of Entry Permit developed by the Authority. Plaintiff was asked only to sign on the dotted line.

 The language of the permit confirms this interpretation. First, the owner for "one dollar and other valuable consideration," granted the Authority an irrevocable right to enter upon the land "to carry out the construction program of the Authority." The contention has been made that the Authority had such a right pursuant to *N. J. S. A.* 20:3–16, irrespective of the property owner's acquiescence. But the entitlement under the permit was substantially broader than that permitted by *N. J. S. A.* 20:3–16. Under the statute, the Authority as a prospective condemnor may enter property to make "studies, surveys, tests, soundings, borings and appraisals" upon 10 days' prior notice. However, here the Right of Entry Permit not only authorized immediate entry, but also expressly granted the Authority the right to clear, grade and drain the land and to erect structures or other improvements. The Authority was also given permission to remove its tools, equipment, buildings and other properties placed on the land after the termination of the permit.

Second, the Authority agreed to pay interest at the rate of 8% on the value of the land as ultimately fixed either by negotiations or a condemnation award between the date of the execution of the permit and the time (a) possession ceased, (b) the parties entered into a contract of purchase, or (c) the Authority instituted condemnation proceedings.

Last, the signature space on the permit contemplated execution only by the grantor.

Furthermore, if the Authority considered the executed permit nothing more than an unaccepted offer, it is difficult

to understand why the Authority in its letter of November 25, 1974 sought plaintiff's agreement that the Right of Entry Permit be "voided and of no force and effect."

■ Viewing the sparse record from the viewpoint most favorable to the plaintiff, *Judson v. Peoples Bank and Trust Co. of Westfield,* 17 *N. J.* 67 (1954), we find the traditional elements of a contract evident. There were an offer, acceptance and sufficient consideration. The Authority's November 12, 1973 letter and Right of Entry Permit constituted an offer which was accepted by the plaintiff's execution and return of the permit. *See Ass'n Group Life, Inc. v. Catholic War Veterans,* 120 *N. J. Super.* 85, 95 (App. Div. 1971), modified 61 *N. J.* 150 (1972). Consideration moved in both directions. The Authority was granted immediate and irrevocable rights. The Authority promised to act promptly to obtain reports and appraisals so that negotiations to fix a fair and just price could be instituted quickly. The Authority also promised to pay the plaintiff 8% of the value of the land between November 20, 1973, when the permit was executed, and the time that possession ceased.

■ The agreement provided that the value of the land was to be fixed "either by negotiations, resulting in an Agreement to Convey; or the results of the ultimate award in condemnation." The Authority contends that determination of value by either method was a condition precedent to the existence of a contract and, accordingly, no contract came into being. This rationale rests on the false assumption that there was never a mutual understanding and that the parties were not bound upon the plaintiff's acceptance. An interpretation of the permit consonant with the Authority's position would defeat the Authority's purpose, namely to provide a method to proceed without experiencing the delays occasioned by condemnation proceedings. As indicated above, the plaintiff's acceptance unconditionally mirrored all the terms of the Authority's offer. Certain rights and duties immediately sprang into existence. The Authority had the

right to enter onto the plaintiff's property, grade and drain the land and erect structures on it. It can thus be seen that even if valuation criteria to be used as factors in fixing the amount of compensation to be paid by the Authority were considered to be conditions, they clearly were not conditions precedent to the formation of the contract.

The provision for valuation of the property bore upon the extent or amount of the Authority's liability and not upon the fact of its liability. In the absence of mutual agreement, the parties intended that the value of the land be fixed at its fair market value, the ultimate test for an award in condemnation. We see no reason why the precise figure may not be ascertained at trial utilizing the same criteria applicable in eminent domain proceedings. Use of that standard is sufficiently certain. In *Van Doren v. Robinson,* 16 *N. J. Eq.* 256 (Ch. 1863), the court recognized the remedy of specific performance to convey land "for a fair price." The Chancellor wrote:

It is further objected that the contract will not be enforced, because the price to be paid for the reconveyance of the land is not ascertained by the contract. The agreement is that the land shall be reconveyed for a *fair price*, if the grantor will accept the deed and pay such price.

It is urged that the effect of the agreement is simply to give to the vendor the refusal of the property, if the parties could agree upon the price. If such be the effect of the contract, the court will not decree a specific performance. An agreement for the sale of land, at a price to be ascertained by the parties, is too incomplete and uncertain to be carried into execution by a court of equity. *Graham v. Call,* 5 *Munf.* 396 [19 *Va.* 396].

But where the contract is that the land shall be reconveyed, not at a price to be agreed upon by the parties, but at a fair price, or at a fair valuation, the court will direct the valuation to be made by a master, and will enforce the execution of the contract. [*Id.* at 260]

The *Van Doren* statement accords with the general rule that a price measured by fair market value is generally held to be sufficiently certain to justify an enforceable obligation.

*See Portnoy v. Brown,* 430 *Pa.* 401, 243 *A.* 2d 444 (Sup. Ct. 1968) ; 1 *Williston, Contracts,* § 41 (3d ed. 1957).

The defendant should not be permitted to escape its obligation because it failed to negotiate promptly in good faith with the plaintiff or because it abandoned the project. Though the Authority may have had sound reasons for changing its plans, its decision prevented the initiation and consummation of condemnation proceedings. The defendant has received all that it was entitled to under the contract and it should not by terminating the agreement be permitted to deprive the plaintiff of moneys due it. *Internal Water Heater Co., Inc. v. Burns Bros.,* 114 *N. J. L.* 368, 373 (E. & A. 1935).

Williston has written that:

> The principle that prevention by one party excuses performance by the other, both of a condition and of a promise, may be laid down broadly for all cases. This statement is frequently quoted. The condition is excused because the promisor has caused the non-performance of the condition. Therefore, it is not enough that the promisor evidently would have prevented performance of the condition. If the promisee could not or would not have performed the condition, or it would not have happened whatever had been the promisor's conduct, the condition is not excused. Any conditions which the facts show might have been performed by him, it will be assumed would have been performed if the conduct of the promisor was such as to preclude the possibility of performance.
> [5 *Williston, Contracts,* § 677 at 231–232 (3d ed. 1957) (footnote omitted)]

*See also Coastal Oil Co. v. Eastern Tankers Seaways Corp.,* 29 *N. J. Super.* 565, 576–577 (App. Div. 1954) ; *Abeles v. Adams Engineering Co., Inc.,* 64 *N. J. Super.* 167, 178 (App. Div. 1960). We hold not that the Authority could not lawfully terminate the agreement, but only that it is responsible for the value of the right to use the property between November 1973 and November 1974, when it surrendered its right to possession.

The Authority also asserts that the Statute of Frauds bars the action. It relies upon *N. J. S. A.* 25 :1–5 which pro-

vides that no action may be brought upon an agreement for the sale of real estate or any interest therein unless the agreement or some memorandum shall be in writing and signed by the party to be charged or some other lawfully authorized person. The precise basis for this defense is unclear. The Authority has submitted no proof that its agent was not authorized to transmit the letter and make the offer. Further, this defense could not be based upon a contention that the letter signed by the Authority's agent is not sufficiently definite in essential terms to satisfy the statute. *See Al–Sco Realty Co., Inc. v. Suburban Apartment Corp.,* 141 *N. J. Eq.* 40 (E. & A. 1947). In this respect it must be remembered that the transmittal letter incorporated by reference the Right of Entry Permit. *See Keller v. Homan,* 136 *N. J. Eq.* 228 (E. & A. 1945). All the necessary and essential terms having been set forth, the writing satisfied the statute's requirements.

Judge Crane in his dissenting opinion commented that "the behavior of the Turnpike Authority in soliciting a right of entry permit in return for a promise of payment of taxes and interest, followed by a repudiation of that promise, borders on the unconscionable." We agree. Decent business morality calls for the Authority to advise property owners expressly and clearly of its right to rescind its acquisition plans. Further, if, in that event, it proposes to pay the landowner nothing, that intention should also be clearly stated.

On this record we see no merit in the defendant's remaining contentions. The judgment of the Appellate Division is reversed and the cause is remanded to the trial court.

HUGHES, C. J., dissenting: I would affirm the judgment of the Appellate Division substantially for the reasons expressed in the majority opinion of that court.

For *reversal and remandment*—Justices PASHMAN, CLIF-FORD, SCHREIBER and HANDLER—4.

For *affirmance*—Chief Justice HUGHES—1.