NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1633-11T4
              A-1677-11T4

DR. & MRS. JOHN PETROZZI;
DR. & MRS. PHILIP LoPRESTI;
MR. & MRS. JACK DOUGHERTY;
MR. NICHOLAS TALOTTA &
MR. THOMAS L. PAGANO;
MR. & MRS. KURT ASPLUNDH;
MR. & MRS. MICHAEL C. COYLE;
MR. & MRS. ANDREW BERENATO;
MR. & MRS. THOMAS PESCI;
MR. & MRS. EDWARD HALES;
MR. & MRS. ROBERT KOONTZ;
MR. & MRS. HARRY BARBIN;
MR. & MRS. R. MARSHALL PHILIPS
and MS. ARLENE DIACO; MS. RUTH E.
ADLAM; MR. & MRS. DANIEL F.
AMOROSO; MS. MARTHA L. ASPLUNDH; MR.
BRETT A. BOAL & MS. LISA MARI
SHEPPARD; MR. & MRS. JOSEPH E.
BUONOMO; MR. & MRS. JEFFREY P.
CARPENTER; MR. & MRS. LARRY
CARRON; MR. HENRY COCCO; MR. &
MRS. DAVID P. DEGLER; MR. PETER
DEPAUL; MR. RONALD J. DiMEDIO;
MR. & MRS. DONALD F. DWYER; MR.
DENNIS ENGLE, MS. LYNN ENGLE & MR.
RICHARD RUTT; MR. & MRS. GROVER
FRIEND; MS. CHRISTINE HANNON;
MR. & MRS. FRANK IACUBUCCI; MR. &
MRS. JOHN JOHNSON; MR. & MRS. DAVID M.
McLAUGHLIN; MR. VICTOR J. MAGGITTI,
JR.; MR. & MRS. JOSEPH M. MARTOSELLA;
MR. & MRS. EUSTACE MITA; MOONRUN
ASSOCIATES, LLC (a/k/a Mumma Family);
MR. & MRS. WILLIAM L. MOPPERT;
MS. VERONICA MORTELITE; DR. & MRS.
JAMES J. NICHOLSON; MR. & MRS. THOMAS
PAGANO; MR. & MRS. DAVID E. PANICHI;

| APPROVED FOR PUBLICATION |
| :---: |
| October 28, 2013 |
| APPELLATE DIVISION |

3808 WESLEY AVENUE, LLC (a/k/a
Powers Family); MR. & MRS. RICHARD A.
RAND; MR. DAVID A. RAND POA;
WILLIAM ROSINI & OCEAN ASSOCIATES;
MR. JAMES D. SCULLY, JR. & M.A.
SCULLY; MS. MAUREEN D. SMITH; MR.
CARL W. STRICKLER; MR. & MRS. RICHARD
SYKORA; MR. STEPHEN B. TANNER; MS.
MARGARET WALTERS; MR. & MRS. G. WILLIAM
FOX,

    Plaintiffs,

MR. & MRS. DANIEL T. HUGHES;
and MR. AND MRS. NICHOLAS J.
TALOTTA,

    Plaintiffs-Respondents,

v.

CITY OF OCEAN CITY, a municipal
corporation; within Cape May
County, State of New Jersey,

    Defendant-Appellant,

and

the DEPARTMENT OF ENVIRONMENTAL
PROTECTION, or its assigns, a
governmental agency formed by the
State of New Jersey,

    Defendant.

_____

DR. & MRS. JOHN PETROZZI;
DR. & MRS. PHILIP LoPRESTI;
MR. & MRS. JACK DOUGHERTY;
MR. NICHOLAS TALOTTA &
MR. THOMAS L. PAGANO;
MR. & MRS. DANIEL T. HUGHES;
MR. & MRS. KURT ASPLUNDA;
MR. & MRS. MICHAEL C. COYLE;
MR. & MRS. ANDREW BERENATO;

A-1633-11T4

MR. & MRS. THOMAS PESCI;
MR. & MRS. EDWARD HALES;
MR. & MRS. ROBERT KOONTZ;
MR. & MRS. HARRY BARBIN;
MR. & MRS. R. MARSHALL PHILIPS
and MS. ARLENE DIACO; MS. RUTH E.
ADLAM; MR. & MRS. DANIEL F.
AMOROSO; MS. MARTHA L. ASPLUNDH; MR.
BRETT A. BOAL & MS. LISA MARI
SHEPPARD; MR. & MRS. JOSEPH E.
BUONOMO; MR. & MRS. JEFFREY P.
CARPENTER; MR. & MRS. LARRY
CARRON; MR. HENRY COCCO; MR. &
MRS. DAVID P. DEGLER; MR. PETER
DEPAUL; MR. RONALD J. DiMEDIO;
MR. & MRS. DONALD F. DWYER; MR.
DENNIS ENGLE, MS. LYNN ENGLE &
MR. RICHARD RUTT; MR. & MRS.
GROVER FRIEND; MS. CHRISTINE
HANNON; MR. & MRS. FRANK IACUBUCCI;
MR. & MRS. JOHN JOHNSON; MR. & MRS.
DAVID M. McLAUGHLIN; MR. VICTOR J.
MAGGITTI, JR.; MR. & MRS. JOSEPH M.
MARTOSELLA; MOONRUN ASSOCIATES, LLC
(a/k/a Mumma Family); MR. & MRS.
WILLIAM L. MOPPERT; MS. VERONICA MORTELITE;
DR. & MRS. JAMES J. NICHOLSON; MR. &
MRS. THOMAS PAGANO; MR. & MRS. DAVID E.
PANICHI; 3808 WESLEY AVENUE, LLC
(a/k/a Powers Family); MR. & MRS.
RICHARD A. RAND; MR. DAVID A.
RAND POA; WILLIAM ROSINI & OCEAN
ASSOCIATES; MR. CARL W. STRICKLER; MR.
& MRS. RICHARD SYKORA; MR. AND MRS.
NICHOLAS J. TALOTTA; MS. MARGARET
WALTERS; and MR. & MRS. G. WILLIAM FOX,

    Plaintiffs,

MR. & MRS. EUSTACE MITA;
MR. JAMES D. SCULLY, JR. &
M.A. SCULLY; MR. STEPHEN B. TANNER;
and MS. MAUREEN D. SMITH;

    Plaintiffs-Appellants,
v.

3

CITY OF OCEAN CITY, a municipal
corporation; within Cape May
County, State of New Jersey, and
the DEPARTMENT OF ENVIRONMENTAL
PROTECTION, or its assigns, a
governmental agency formed by the
State of New Jersey,

    Defendants-Respondents.

_____

Argued September 9, 2013 — Decided October 28, 2013

Before Judges Parrillo, Harris and Kennedy.

On appeal from the Superior Court of New
Jersey, Law Division, Cape May County,
Docket No. L-218-05.

Michael P. Stanton argued the cause for
appellant (A-1633-11)/respondent (A-1677-11)
Ocean City (McCrosson & Stanton, P.C.,
attorneys; Dorothy F. McCrosson, of counsel
and on the brief).

Frank L. Corrado argued the cause for
appellants (A-1677-11) Mita, Scully, Tanner
and Smith (Barry, Corrado & Grassi, P.C.,
attorneys; Mr. Corrado, on the briefs).

Kenneth A. Porro argued the cause for
respondents (A-1633-11) Hughes and Talotta
(Wells, Jaworski & Liebman, L.L.P.,
attorneys; Mr. Porro, of counsel and on the
brief; Spencer J. Rothwell, on the brief).

Matthew T. Kelly, Deputy Attorney General,
argued the cause for respondent (A-1677-11)
New Jersey Department of Environmental
Protection (John J. Hoffman, Acting Attorney
General, attorney; Melissa H. Raksa,
Assistant Attorney General, of counsel; Mr.
Kelly, on the briefs).

The opinion of the court was delivered by

PARRILLO, P.J.A.D.

These back-to-back appeals, consolidated for purposes of this opinion, present recurrent issues facing shore communities and their residents. In A-1677-11, we are asked, primarily, to determine whether a municipality's failure to perform its part of easement agreements with owners of beachfront properties is due to reasonably unforeseen circumstances beyond its control so as to be relieved of its contractual duty, and, if so, whether these homeowners are nevertheless left without a remedy. In A-1633-11, we determine, where municipal liability has been established, the proper measure of damages for the loss occasioned by the municipality's breach. Collateral issues concern the viability of the homeowners' inverse condemnation claims against the municipality and the State, through its Department of Environmental Protection (DEP), and whether certain plaintiffs had established their ownership of affected beachfront property.

By way of background, prior to 1987, Ocean City did not have a significant dune system to provide shore protection and, instead, relied upon dunes that were naturally created. To rectify the problem, in 1989, Ocean City participated in a beach

5

replenishment and dunes restoration program with a cost-sharing ratio involving the State and federal government.

Before pumping sand from the sea to create the dune system, however, the Army Corps of Engineers required that Ocean City either own the beach or have access rights where the sand was to be placed. Thus, since a portion of the area identified for the dune system was privately owned, Ocean City would have to either acquire easements from beachfront property owners, or pursue the more time-consuming process of condemnation. Ocean City chose the former course.

To ease property owners' concerns over their beachfront views, beginning on April 26, 1991, Ocean City proposed easements containing a restriction that the municipality would construct and maintain the dune system with a height limitation of no greater than three feet above the average elevation of the bulkhead (i.e., twelve feet) in the block in which the property was located. Although the 1991 regulations promulgated pursuant to the Coastal Area Facility Review Act (CAFRA), N.J.S.A. 13:19-1 to -21, did not require a municipality to seek a CAFRA permit from DEP for dune maintenance, nevertheless a series of State Aid Agreements entered into between Ocean City and the State

since 1987 required the municipality to obtain the agency's written authorization before commencing a dune maintenance.[1]

From May 1, 1992 to December 8, 1995, Ocean City acquired the necessary easements, including the three-foot height restriction,[2] from individual beachfront property owners. Not surprisingly, between 1992 and 2000, natural accretion caused areas of the dunes to grow in height and width, and the affected

---

[1] Specifically, paragraph 4 of the 1987 State Aid Agreement provided that "[t]he municipality shall not undertake any mechanical manipulation including[,] but not limited to[,] bulldozing, grading, scraping, of the beach and dune areas unless written authorization is received from the Division of Coastal Resources."

[2] The Perpetual Easement Deed stated:

> As a further consideration for the grant of this easement, the Grantee [Ocean City] covenants that it shall perform, allow or arrange for the following:
>
> . . . .
>
> (3) Dunes created pursuant to this grant shall not exceed the average elevation of the bulkhead in Block by more than three (3) feet. The Grantee shall construct and maintain the dune system in a fashion to comply with this height limitation.

In addition, Ocean City agreed to maintain beach access over the dunes by creating an eight-foot access way mid-block to the ocean and an open twenty-foot wide pathway adjacent to and parallel with the existing bulkheads. The easements obtained by plaintiffs or their predecessors in title were all obtained in 1992.

7

property owners began requesting that Ocean City comply with the dune maintenance provision in their easement agreements. By this time, however, by virtue of CAFRA amendments effective July 19, 1994[3] that included dune construction and maintenance as a regulated activity, Ocean City was required to apply for a CAFRA permit prior to performing dune maintenance to alter the size or height of any dunes within the municipality.[4]

Consequently, on May 29, 2002, Ocean City filed with DEP a CAFRA permit application to reduce the height of existing sand dunes by mechanical excavation to an elevation of three feet above the twelve-foot height of the existing adjacent bulkhead. The agency deemed the application administratively complete, but on May 17, 2005, denied the permit for non-compliance with governing regulations. We affirmed the agency's action in an unpublished opinion. City of Ocean City v. New Jersey Dep't of Envtl. Protection, A-5199-06 (App. Div. September 26, 2008).

---

[3] An amendment to N.J.S.A. 13:19-5 provided that "[a] permit . . . shall be required for . . . [a] development located in the coastal area on any beach or dune." L. 1993, c. 190, § 5. This amendment was approved on July 19, 1993 and stated that it "shall take effect one year from the enactment date of this act." Ibid. Thus, a CAFRA permit was required for dune maintenance after July 19, 1994.

[4] In fact, several easements were executed after the effective date of the July 19, 1994 CAFRA amendments, including those involving plaintiffs-respondents in A-1633-11.

Contemporaneously, on May 2, 2005, individual Ocean City property owners filed a complaint in the Law Division against Ocean City alleging, among other things, that Ocean City breached its easement agreements by not maintaining the height limitation on the beachfront dunes, causing the property owners to lose their view, access and privacy. On October 4, 2005, they filed an amended complaint naming additional plaintiffs and DEP as an additional defendant, alleging that DEP "had full knowledge, participated and agreed to the dunes project in question." A second amended complaint added, among other claims against Ocean City and DEP, a cause of action for inverse condemnation.

Out of the original ninety-five individual plaintiffs representing sixty-three beachfront properties, by time of trial only twenty-five plaintiffs remained, representing seventeen properties, including the six appellants in A-1677-11 and the four respondents in A-1633-11. Ocean City was the lone defendant, the court having dismissed, on summary judgment motion, plaintiffs' breach of contract claims against DEP, because DEP was not a party to the easement agreements, and plaintiffs' inverse condemnation claim, because plaintiffs had not established a regulatory taking and had not lost

9

substantially all of the beneficial use of the totality of their properties.

A bifurcated bench trial was held on liability and damages. As to the former, the only remaining claims against Ocean City were breach of the easement agreements and inverse condemnation. At the conclusion of the eight-day trial on liability, the Law Division dismissed the inverse condemnation claims of all plaintiffs as well as the breach of contract claims of all[5] but the four plaintiffs who had entered into easement agreements with Ocean City <u>after</u> the effective date — July 19, 1994 — of the CAFRA amendments.  Those four plaintiffs, each two of whom own a beachfront condominium in the same two-unit, two-story structure in Ocean City and who are respondents in A-1633-11, proceeded to a three-day damages trial, at the conclusion of which the court awarded $70,000 to the first-floor occupants (Mr. and Mrs. Daniel Hughes) and $35,000 to the second-floor occupants (Mr. and Mrs. Nicholas Talotta).

---

[5] The breach of contract claims of two of these plaintiffs, Mr. and Mrs. Eustace Mita, were dismissed as well on the ground they failed to prove ownership of the affected beachfront property.

As to liability, in dismissing the claims of the six plaintiffs who are appellants in A-1677-11,[6] the court found that the 1994 CAFRA amendments rendered impossible Ocean City's performance under the easement agreements pre-dating the effective date of those amendments and, therefore, relieved the municipality of its contractual obligations. Finding performance excused and no contractual breach, the court held Ocean City was not liable to plaintiffs for damages, especially since they received the benefit of added storm protection as a result of the dune creation. The court also dismissed plaintiffs' inverse condemnation claims against Ocean City on the same grounds it had previously rejected identical claims against DEP, namely that neither DEP nor Ocean City physically appropriated plaintiffs' properties and that plaintiffs had not shown substantial loss of use required for a compensable regulatory taking.[7]

---

[6] With respect to the Mitas, the court additionally found these appellants did not have riparian ownership of the area on which the dunes were constructed.

[7] The court stated:

> Under general principles a property owner is
> barred from any claim to a right of inverse
> condemnation unless deprived of all or
> substantially all of the beneficial use of
> the totality of [the] property as the result
> of excessive police power regulation.

(continued)

11

These six plaintiffs now appeal the dismissal of their breach of contract and inverse condemnation claims, seeking liability judgments in their favor. They argue, alternatively, that even if Ocean City were discharged of its contractual duties, plaintiffs are nevertheless entitled to restitution as an equitable remedy to compensate them for the benefit they conferred on the municipality. Plaintiffs also contend that the 1994 CAFRA amendments, which prevented Ocean City from reducing the height of the dunes seaward of their property and therefore interfered with their ocean views and reduced the value of their beachfront dwellings, effected a regulatory taking of their property without just compensation.[8]

As to those four plaintiffs (respondents in A-1633-11) who executed easement agreements after the July 19, 1994 effective date of the CAFRA amendments, the court found municipal liability because Ocean City was on notice at that time that it could be barred from dune adjustment, and therefore the

_____

(continued)

> [Orleans Builders & Developers v. Byrne, 186 N.J. Super. 432, 446 (App. Div.), certif. denied, 91 N.J. 528 (1982) (citing Penn Central Transp. Co. v. New York City, 438 U.S. 104, 127, 98 S. Ct. 2646, 2661, 57 L. Ed. 2d 631, 650 (1978)).]

[8] Additionally, the Mitas contend the court erred in finding their lack of ownership.

12

impossibility defense did not apply. As such, following a damages trial at which both sides presented expert appraisal testimony, the court, finding their methodologies flawed, nevertheless awarded $70,000 to the first-floor residents of a beachfront condominium building and $35,000 to the second-floor owners. Ocean City appeals from this judgment, arguing that respondents' failure to offer competent expert proof quantifying the effect of loss of beach views on the value of their real property precludes an award of compensatory damages.

We first address the issues raised in A-1677-11.

## I.  A-1677-11

Plaintiffs argue that Ocean City, having entered into the easement agreements solely by virtue of authority delegated by the Legislature, is in effect the State's alter ego and agent and, therefore, should not be allowed to assert the defense of impossibility based on what are, in essence, its own actions in rendering those contracts ineffective. And, even if considered a separate entity, Ocean City is still not entitled to the defense because the State's disapproval of Ocean City's permit application was reasonably within the municipality's contemplation when it promised plaintiffs it would limit dune height. We disagree.

13

"Impossibility or impracticability of performance are complete defenses where a fact essential to performance is assumed by the parties but does not exist at the time for performance." Connell v. Parlavecchio, 255 N.J. Super. 45, 49 (App. Div.), certif. denied, 130 N.J. 16 (1992). "Even if a contract does not expressly provide that a party will be relieved of the duty to perform if an unforeseen condition arises that makes performance impracticable, 'a court may relieve him of that duty if performance has unexpectedly become impracticable as a result of a supervening event.'" Facto v. Pantagis, 390 N.J. Super. 227, 231 (App. Div. 2007) (quoting Restatement (Second) of Contracts § 261 comment a (1981)); see also M.J. Paquet, Inc. v. N.J. Dep't of Transp., 171 N.J. 378, 390-91 (2002).

The basis of the defense is "the presumed mutual assumption when the contract is made that some fact essential to performance then exists, or that it will exist when the time for performance arrives." Duff v. Trenton Beverage Co., 4 N.J. 595, 605 (1950) (internal quotation marks and citation omitted). The inquiry, therefore, is whether the condition "is of such a character that it can reasonably be implied to have been in the contemplation of the parties at the date when the contract was made." Ibid. (internal quotation marks and citation omitted).

14

In other words, the parties must not have reasonably foreseen the change that rendered the contract performance impossible or impracticable. As expressed in the Restatement:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.
>
> [Restatement (Second) of Contracts, supra, § 261.]

Specifically when dealing with a subsequent government act, "[i]f the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made." Restatement (Second) of Contracts, supra, § 264.

To be sure, a party cannot render contract performance legally impossible by its own actions, Creek Ranch, Inc. v. New Jersey Turnpike Authority, 75 N.J. 421, 432 (1978), as plaintiffs allege Ocean City did here. However, Ocean City, as promisor, neither caused non-performance of its promise nor reasonably contemplated the change in the law that rendered its performance impossible or impracticable.

15

As to the former, the mere conferral by the Legislature of the power to contract, N.J.S.A. 40:48-1.2; N.J.S.A. 40:43-1; N.J.S.A. 40A:12-4(a); Becker v. Adams, 37 N.J. 337, 340 (1962), does not make the State the contracting party.  On the contrary, it is undisputed that the State was not a party to the easement agreements, which were negotiated, drafted and executed by the municipality and agreed to by the individual property owners.  Moreover, as we found in our earlier opinion affirming the agency's denial of Ocean City's permit application, DEP neither endorsed, condoned nor approved the dune maintenance height restriction in those easement agreements.  City of Ocean City, supra, slip. op. at 11.

Although Ocean City, as a subdivision of the State, derived its authority to contract from the State, it does not follow that the municipality was acting as an agent of the State when it entered into the easement agreements with its oceanfront residents.  Clearly, Ocean City was acting in its (and its residents') own best interests when it sought to obtain easements to create and maintain dunes along its coast, just as the State was acting in the best interests of all its citizens when it sought to include, through the 1994 CAFRA amendments, dune construction and maintenance as regulated activities requiring a permit from DEP.  Undeniably, Ocean City had no

16

control over the legislative enactment, which required the municipality to submit to a formal application and approval process, over which Ocean City also had no control. Obviously then, the entity that contracted and the entity that rendered performance thereunder impracticable are separate and distinct.

Not only were the CAFRA amendments and DEP's subsequent disapproval of Ocean City's permit application beyond the municipality's control, they were also not reasonably foreseeable events. As noted, while a series of State Aid Agreements governing funding for Ocean City's beach replenishment projects required DEP's authorization to reduce the height of the dunes, under 1991 CAFRA regulations then in effect, no CAFRA permit was required and Ocean City was free to engage in beach maintenance activities without submitting an application to the agency. Indeed, given the mutual goals of beach replenishment and dune creation shared with the State, it was entirely reasonable for the municipality to assume that it would be permitted to carry out the three-foot height restriction and thus fulfill its dune maintenance obligations to plaintiffs, who allowed Ocean City access to their beachfront property to create the dunes in the first instance. And even after adoption of the CAFRA amendments on July 19, 1993, it was still reasonable for Ocean City to conclude that it would obtain

17

a DEP permit, especially considering the fact that the legislation provided a waiver of the permit process for grading and excavating dunes. N.J.S.A. 13:19-5.3.[9]

Having excused Ocean City's performance as impossible or impracticable, the trial court found no liability for damages. With this latter ruling, we part company. In our view, the court erred in concluding that because Ocean City did not breach the contract, plaintiffs are not entitled to monetary relief.

"Where one party to a contract is excused from performance as a result of an unforeseen event that makes performance impracticable, the other party is also generally excused from performance." Facto, supra, 390 N.J. Super. at 233-34; see also Restatement (Second) of Contracts, supra, §§ 237, 239, 267. Even though the non-performing party is not in breach because the impracticability doctrine discharges the duty, "'it cannot demand something for nothing from the other party.'" Facto, supra, 390 N.J. Super. at 234 (quoting 14 Corbin on Contracts, §

---

[9] N.J.S.A. 13:19-5.3 provides:

> The commissioner may waive the permit
> requirement for development . . . for any
> development that involves the grading or
> excavation of a dune by a governmental
> agency if the commissioner finds that such a
> waiver is warranted as a result of a storm,
> natural disaster or similar act of God.

18

78.2 (Perillo Rev. 2001)).  As the <u>Restatement</u> makes abundantly clear, a contractual impracticability does not render the performing party remediless:

> (1)  In any case governed by the rules stated in this Chapter, either party may have a claim for relief including restitution under the rules stated in §§ 240 and 377.
>
> (2)  In any case governed by the rules stated in this Chapter, if those rules together with the rules stated in Chapter 16 will not avoid injustice, the court may grant relief on such terms as justice requires including protection of the parties' reliance interests.
>
> [<u>Restatement (Second) of Contracts</u> § 272 (1981).]

Here, the parties agreed upon an exchange of performances and because of events not reasonably foreseen, Ocean City's part of the exchange cannot now take place.  Yet the fact remains plaintiffs surrendered their right to compensation in reliance on Ocean City's promise to protect their ocean views.  Absent that reliance, Ocean City would have had to pay plaintiffs for depriving them of their views.  If Ocean City may retain the benefit of this bargain despite its failure to perform its promise — even if performance was impracticable — without consequence, the municipality would reap a windfall at plaintiffs' expense and plaintiffs would have given "something for nothing."  <u>Facto</u>, <u>supra</u>, 390 <u>N.J. Super.</u> at 234 (quoting 14

19

Corbin on Contracts, supra, § 78.2). Equity, however, demands some relief for plaintiffs and, therefore, a hearing to determine a fair and just restitutionary amount is warranted.

The question remains how to measure damages for restitution in this case. Obviously, the fixing of an appropriate restitutionary amount must consider the value of that which plaintiffs have been deprived, including loss of, or interference with, their ocean views due to the accretive effects. But offset against the burdens suffered by plaintiffs are the potential gains conferred by the partial consideration performed by Ocean City to date, namely the non-speculative, reasonably calculable benefits arising from the municipality's dune project. These may include the added wave/storm surge protection afforded by the accretive effect of the dunes. See Borough of Harvey Cedars v. Karan, 214 N.J. 384, 416 (2013). We emphasize that the remedy we grant is an equitable one, and not a substitute for eminent domain, for which a jury trial is not appropriate.

Thus, all plaintiffs, save the Mitas, are entitled on remand to a hearing to determine a fair and just restitutionary amount for performing their part of the bargain with Ocean City. As noted, in fixing the appropriate level of compensation, the

20

court should consider, upon the requisite proofs, all the factors we have previously identified.

As for the Mitas, for the reasons expressed by the trial judge in his written opinion of September 9, 2010, we find they have failed to prove by competent credible evidence their riparian rights in the easement area and therefore affirm the dismissal of their complaint against defendants in its entirety. Suffice it to say, originating from the State, "a riparian grant is a conveyance in fee simple of real property[;] [a]s such, without specific mention in the deed or other evidence that the parties intended its inclusion, a riparian grant will not pass as appurtenant to another district parcel." Panetta v. Equity One, Inc., 190 N.J. 307, 309 (2007). In other words, a riparian grant must be explicit in a real estate conveyance and the Mitas presented no documentary proof expressly and definitively supporting their claim.

As the trial judge noted here:

> It may well be that at some point some of the oceanfront owners['] predecessors in title received a grant; but if that grant was not passed on in the chain of title then it remains a separate parcel. The required riparian ownership only adheres in the initial transaction with the State. A riparian grant is the conveyance of real property divided from the uplands by a fixed boundary, no different from any other conveyance of land.

21

The Mitas were not a party to the original easement dated March 10, 1992, and failed to establish a chain of title through which they received a riparian grant. Specifically, the Mitas offered no deed by which they took title from the grantor (the Maffuccis) on the perpetual deed of easement to Ocean City, which "expressly acknowledged ownership of the beachfront property and that included a metes and bounds description of the property as part of the deed of easement." In fact, the only document produced by the Mitas was a 2007 deed from grantor Eustace Mita, who had purchased the property on June 1, 1996, to himself and his wife Suzanne Mita as grantees. While the document refers to a riparian grant, there is, as noted, no deed in this record by which the Mitas obtained title from the grantor on the deed of easement.[10] The Mitas did produce a survey describing the property in issue, but did not explain its source and therefore the document does not definitively establish any riparian grant to the Mitas. Nor does their unsubstantiated claim that Ocean City "has assessed property

---

[10] When the Mitas' counsel asked Mr. Mita who owned the property, he replied "my wife and I are the owners through a trust."

taxes on the beachfront lot against the Mitas and their predecessors."[11]  As the trial judge properly noted:

> [T]he [c]ourt cannot rely upon the issuance of tax bills as proof of ownership based upon the record.  Proof of the ownership, as indicated, would be available by title search and deed or survey.  Any of these would have been acceptable.  That evidence was not produced for [the Mitas].

Because we have found the remaining plaintiffs-appellants entitled to a restitutionary hearing, we need not dwell on their alternative claim to compensation.  Simply stated, plaintiffs claimed a right to inverse condemnation by a "regulatory taking," which they were barred from asserting unless deprived of all or substantially all of the beneficial use of their property by virtue of governmental regulations.  Orleans Builders & Developers v. Byrne, 186 N.J. Super. 432, 446 (App. Div.), certif. denied, 91 N.J. 528 (1982); see also Penn Central Transp. Co. v. New York City, 438 U.S. 104, 127, 98 S. Ct. 2646, 2661, 57 L. Ed. 2d 631, 650 (1978).  As our Supreme Court has stated:

> Diminution of land value itself does not constitute a taking.  Similarly, impairment of the marketability of land alone does not effect a taking. . . .  A regulatory scheme will be upheld unless it denies all

---

[11] The Mitas did not produce any tax documents.  During trial, when asked if he pays a "tax bill for the property extending to the ocean," Mr. Mita responded, "I don't know."

23

> practical use of property, or substantially destroys the beneficial use of private property, or does not allow an adequate or just and reasonable return on investment[.]
>
> [Gardner v. N.J. Pinelands Comm'n, 125 N.J. 193, 210-11 (1991) (internal quotation marks and citations omitted).]

The trial judge, here, found that the subject properties diminished in market value only between fifteen to thirty-five percent, and therefore rejected plaintiffs' inverse condemnation claim because plaintiffs "still maintain[ed] beneficial use of much of their property." No one disputes the court's factual finding, to which we defer, and his legal conclusion is unassailable. See Bernardsville Quarry v. Borough of Bernardsville, 129 N.J. 221, 239-40 (1992) (finding no taking where the property value decreased from $34,000,000 to $2,700,000; a 92% decrease); In re Loveladies Harbor, Inc., 176 N.J. Super. 69, 73 (App. Div. 1980), certif. denied, 88 N.J. 501 (1981) (finding no taking where a regulation left a property owner able to develop only 25% of his property, stating there was still "substantial potential use"). Therefore, plaintiffs' claims of inverse condemnation against Ocean City and DEP were properly dismissed as plaintiffs failed to demonstrate they were deprived of "all or substantially all of the beneficial use" of their properties. Orleans Builders, supra, 186 N.J. at 446.

24

Having found Ocean City liable to four plaintiffs, namely two couples who each own in condominium form a unit in a two-unit, two-story beachfront dwelling, the judge proceeded to a three-day bench trial to determine the amount of damages to which each plaintiff was entitled.  The hearing produced the following undisputed facts.  The Hughes plaintiffs bought the entire duplex, built in 1962, in 1974 along with other investors and took title to the first-floor unit in 1981.  The Talottas purchased the second-floor unit in 1987.  At the time, there were no dunes in front of the property as the area was essentially flat during the 1970's and 1980's.  Both plaintiffs have riparian rights out to the high water line.

The perpetual easement deed executed between the plaintiffs' condominium association and Ocean City on May 2, 1995, well after the CAFRA amendments, acknowledged, as part of the consideration, the benefit to be received from construction of the sand dune system for shore erosion control.  As with all other plaintiffs, the easement was also subject to certain conditions, namely: (1) the owners would have mid-block access to the beach over any dune created not to exceed eight-feet in width; (2) there would be a twenty-foot-wide pathway running parallel to the ocean; and (3) most notably, for present

purposes, the dunes created would not exceed an average elevation of three feet two inches above the bulkhead. Ocean City expressly represented to plaintiffs that if they did not grant a perpetual easement, the municipality would proceed to condemnation through eminent domain proceedings.

Ocean City complied with the height requirement for several years, until about 1995 when there appeared significant changes in dune structure and plantings. In fact, the last measurement, from April 2007, concluded the dune was 6.224 feet above the three-foot two-inch limit at the north dune point and 4.44 feet above the limit at the south dune point. Consequently, these plaintiffs, along with others, sued for loss of breeze, loss of access, and loss of ocean view. At the conclusion of the bench trial, the judge found no damages for loss of breeze due to lack of evidence and no damages for loss of access because, as part of the bargain, Ocean City built a pathway along the property. This much is not in dispute or an issue here.

The core issue at trial was loss of view and its valuation. Actually, it was undisputed that these plaintiffs suffered a loss of view, as the trial judge observed first hand in his two visits to the site in question. Where the plaintiffs and the municipality parted company was the amount of damages attributed to this loss, as all agreed that ocean view has value and the

26

deprivation or diminution of view is compensable if the market recognizes such loss.

On this issue, plaintiffs' expert Robert Gagliano, a certified appraiser, employed the sales comparison approach, which he described as an "appraisal procedure in which the market value of a property is estimated by direct comparison and analysis of the sales of similar substitute properties." Gagliano originally appraised each of the two units at $1,000,000.[12] Then to establish the effect of growing dune height on the market value of a first-floor condo unit, Gagliano set up two classifications, comparing plaintiffs' units to pre-2000 sales and post-2000 sales, noting that issues associated with elevated dune height did not become apparent until after 2000.

Gagliano identified seven properties where the first and second floor units were sold between 1987 and 2000 as comparable although he did not obtain access to any of them to verify their views of the ocean. He also made no adjustments as he would normally have done in an appraisal process, such as conditions

---

[12] The original $1,000,000 appraisal was based on sales of seven properties — all first-floor condominium units — considered comparable that took place between February 17, 2006 and January 31, 2008. Gagliano provided adjustments for date of sale (timing), condition/quality/age of the properties; room count; gross living area; and construction quality.

of sale, date of transaction and physical characteristics. Gagliano established a value difference for the seven properties between 1.10% and 15.52% solely based on the gross sales price difference of the first floor and the second-floor without any adjustments for view, age, construction or condition. A median of 6.96% was obtained from these comparisons.

Gagliano also identified six properties sold after 2000. Once again, he made no adjustments for design, quality, condition, or view and simply relied on gross sales price. He arrived at a median difference in value between first floor and second floor units of 21.33%.

Gagliano subtracted the median value difference of 6.96% for sales between 1987 and 2000 from the median value difference of 21.33% for post-2000 sales to reach a result of 14.3%, rounded up to 15%, which he then concluded was the percentage (15%) impairment of value based upon the height of the dunes and assumed loss of view. Gagliano therefore estimated the loss in value of the Hughes' first-floor property to be $150,000 after applying the 15% calculation to the original appraisal value of $1,000,000. Gagliano arrived at the same loss in value for the

28

Talotta's second-floor unit after applying the 15% calculation to the appraisal value of $1,000,000.[13]

Ocean City's appraiser, Paul Johnson, used a methodology valuation that was limited to the reduction in value of the structure on the property.  He attributed no loss of value to the land itself.  Johnson concluded that any diminution would be limited to the life of the building on the property, which he opined was nine years.  Johnson found a higher loss in value for the second-floor unit than the first-floor unit, determining a diminution in value of $1,800 for Hughes and $3,000 for Talotta.

The trial judge rejected both analyses as "flawed."  He criticized Gagliano's methodology for failing to factor in the usual adjustments and failing to evaluate the height of the dunes in front of, and the view from, any of the properties considered "similar."[14]  The judge also faulted Gagliano's

---

[13] However, when Talotta complained to Gagliano that his property was more valuable than that of Hughes, Gagliano revised the value of the Talotta property to $1,210,000 and after applying the 15% factor, arrived at a loss of value of $180,000.

[14] Specifically, the judge found:

> The weakness in the appraisal is in part
> based upon not having more detailed
> knowledge of the view from each property
> which of course is the charge he was given
> in terms of valuation; i.e., to estimate the
> impact of dune growth and loss of view on
> the value of the property.  Therefore his

(continued)

29

application of the 15% impairment factor to both first and second floor properties when the loss of view is greater for the former.

The judge similarly criticized Johnson for "invert[ing]" the values and finding a higher loss for the second-floor unit than the first-floor unit. But even more fundamentally, the judge disagreed with Johnson's belief that diminution in value is limited to the nine-year life of the obsolete building on plaintiffs' property, finding instead "that view affects land value and not just structure value."

Having faulted both approaches, the judge nevertheless found plaintiffs' loss of view compensable and that the severance analysis employed in City of Ocean City v. Maffucci, 326 N.J. Super. 1 (App. Div.), certif. denied, 162 N.J. 485 (1999), an eminent domain case, was "appropriate to evaluate the breach of contract damages for violation of the Easement Agreement" because if there had been no easement agreement, there would have been condemnation by eminent domain.

In Maffucci, a first-floor oceanfront property owner at 2825 Wesley Avenue, six blocks north of plaintiffs' property in the 3600 block of Wesley, would not agree to a $1 easement for a

(continued)
          appraisal differentials are weak at their
          very foundation.

30

50' by 80' strip of beach.  326 N.J. Super. at 4-5.

Consequently, Ocean City decided to take the property by eminent

domain.  Id. at 4.  A jury trial ensued after the condemnation

commissioners declared just compensation to be only $1.00.  Id.

at 5.  Over Ocean City's objection, the trial judge allowed the

jury to consider evidence of loss of access and view.  Id. at

13.  The jury returned a verdict of $1.00 for the easement and

$37,000 for severance damages, i.e., compensation for the

diminution in value of the property remaining after the

"taking."  Ibid.[15]

We upheld the verdict on appeal.  Finding that the loss of

ocean view and access are elements for which severance damages

may be awarded, id. at 18, we held that there was evidence to

support the conclusion that the Maffuccis lost their ocean view,

beach access and privacy, id. at 14.  As to valuation, while we

recognized that "the amount of the severance damages occurring

as a result of the taking, could not be calculated with any

degree of accuracy or fairness[,]" id. at 15, we nevertheless

ruled that "where only a portion of a property is condemned, the

---

[15] The Maffuccis' expert, a real estate broker, had estimated
total severance damages at $100,000; $75,000 was damage to the
first floor and $25,000 was damage to the second floor.  He
based his opinion on before and after sales using the before and
after sales of comparable properties.  He attributed 60% to loss
of view; 20% to loss of access; 10% to loss of use; and 10% to
loss of privacy.  Id. at 6.

31

measure of damages includes both the value of the portion of land actually taken and the value by which the remaining land has been diminished as a consequence of the partial taking." Id. at 18 (citing State, by Comm'r of Transp. v. Silver, 92 N.J. 507, 513 (1983)).  To determine the value of the property remaining after the partial taking, we found that:

> [A]n examination of all of the characteristics of such remaining property after the time of the taking, as opposed solely to facts in existence at or immediately before condemnation, is inescapable.  Therefore, in the case of a partial taking, the market value of property remaining after a taking should be ascertained by a wide factual inquiry into all material facts and circumstances — both past and prospective — that would influence a buyer or seller interested in consummating a sale of the property.
>
> [Id. at 19 (quoting Silver, supra, 92 N.J. at 515).]

Here, applying Maffucci's severance analysis, the trial court quantified plaintiffs' respective damages, reasoning:

> In spite of the inadequate appraisal testimony by the experts, the Court is not constrained from making an award for loss of view.  It does not take an expert to arrive at the conclusion that view has value.  The best and most expensive seats in the theatre are close up with the best view.  The best and most expensive regular seats at major league baseball are near home plate and along the first and third base lines close up to the field.  At football games, we hope to be at or close to the fifty (5[0]) yard line.

32

We also know intuitively that built into the value of oceanfront property is the quality of the view of the beach and ocean beyond. The closer to the beach, the higher the rent and the higher the purchase price for similar properties. Therefore, if a contract provides protection for that view as in the Easement Agreement, failure to protect it is a breach of contract. Valuation of the breach is the issue. The award of damages need not be precise based on an expert opinion. Here the Court makes the award based on a number of factors. The decrease in market value is one such factor. The Court finds that the increase of dune height and loss of view caused thereby negatively affects market value. The Court does not accept the determinations of either expert. However, the differential in first floor and second floor values on the ocean reflect in part the views. The height of the dunes impacts the ground level property substantially more than the second floor property regardless of the value of the respective units. However, the width of the dunes toward the ocean also may affect value and that is not compensable and is not a breach of this contract. That width increases the distance to the usable beach for sunbathing and swimming. The first floor property has suffered the most severe loss of view because it is a 1962 home built at ground level and not raised up to full zoning height. That loss may or may not be temporary. Clearly, new construction, including nearby this property, is at a greater height so even the first floor of living area would enjoy better views if so constructed hereafter. The Perpetual Easement Deed runs with the land so longevity can be a factor. However, dune protection comes and goes. The nature of our coast in New Jersey sometimes restores view by taking away dune protection. The property owners here are long time oceanfront property owners — Hughes since

33

1974 and Talotta since 1987 and have maintained ownership during the entire period of conflict with the City.

The Hughes' claim results in a compensable loss of view for the first floor unit and common elements of $70,000.

The Talotta claim results in a compensable loss of view for the second floor unit and common elements of $35,000.

On appeal, Ocean City contends that plaintiffs are not entitled to an award of compensatory damages for diminution in the value of their properties because having rejected both experts' analyses, there was no competent evidence upon which the court could ascertain the loss. We disagree.

In the first place, it is beyond question that plaintiffs suffered a loss of ocean view, that such a loss has value, and that the loss is compensable. Both experts agreed to at least as much, and the documentary, photographs and testimonial proofs leave no room to doubt these facts. Moreover, the analytical framework used to measure the damages espoused in Maffucci, supra, was adopted by the trial judge in this case. And governed by that standard, the judge assessed the expert proofs and found them wanting, which he was free to do. Cnty. of Ocean v. Landolfo, 132 N.J. Super. 523, 528 (App. Div. 1975); see also Trenton v. John A. Roebling Sons Co., 24 N.J. Super. 213, 219 (App. Div. 1953) ("The determination of the weight to be given

34

to the statements of expert witnesses in the first instance is for the hearing tribunals, and that weight depends upon their candor, intelligence, knowledge, experience, and especially [upon] the facts and reasoning which are the foundation of their opinion.").[16]

While we agree with the trial judge's critique of the expert proofs and his adoption of the Maffucci methodology, we are unclear as to how he otherwise arrived at the severance damages awarded to plaintiffs in this case.  Although the judge stated that he considered the decline in market value caused by the loss of ocean view as one of several factors, he failed to mention how that decline was quantified and failed to identify the other factors taken into account in his valuation.  Perhaps the court, in its embrace of the Maffucci approach, also took note of the values ascribed therein, given the proximity of the properties to the two units involved here.  But we question whether that was indeed the case, as we do the propriety of such reliance.

---

[16] Plaintiffs' expert failed to observe the view from the "comparable" properties and made no adjustments in the "before and after" comparison sales to account for differences in quality, area and condition, among other attributes.  Ocean City's appraiser's methodology was also flawed as he relied on the reduction in value of the structure and not the property, even though dune height undoubtedly affects the property value.

35

To be sure, "[f]indings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence." Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484 (1974). Our appellate function, on the other hand, is a limited one:

> we do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice, and the appellate court therefore ponders whether, on the contrary, there is substantial evidence in support of the trial judge's findings and conclusions.
>
> [Ibid. (internal quotation marks and citations omitted).]

However, "[i]t is important that a trial court make specific findings, particularly when faced with a complex financial valuation question, so that the parties and reviewing court may be informed of the rationale underlying the court's conclusion." Orgler v. Orgler, 237 N.J. Super. 342, 358 (App. Div. 1989); see also Esposito v. Esposito, 158 N.J. Super. 285, 291 (App. Div. 1978). Because the trial court here failed to make specific findings as to its damages awards, we are constrained to remand the matter for further explication of its fact determinations and conclusions of law. However, before rendering any further explication of its rationale, we suggest

36

that, as with the remand hearing ordered for the other plaintiffs in A-1677-11, the remand judge allow further proofs of valuation, consistent not only with Maffucci's analytical framework, but as well with the admonition in Borough of Harvey Cedars v. Karan that "the quantifiable decrease in the value of their property -- loss of view -- should [be] set off by any quantifiable increase in its value -- storm-protection benefits[.]" 214 N.J. at 418. Along with any "non-speculative, reasonably calculable benefits from the dune project," id. at 387, the remand judge should inquire "into all material facts and circumstances . . . that would influence a buyer or seller interested in consummating a sale of the propert[ies]" in question. Maffucci, supra, 326 N.J. Super. at 19.

In A-1677-11, affirmed in part, reversed and remanded in part.

In A-1633-11, remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1633-11T4